Mr. Justice CATRON
 

 delivered the opinion of the court.
 

 On the 10th day of December, A. D. 1847, the State of Missouri, filed her original. bill in this court, according to the third article and second section of the Constitution, against the State of Iowa, alleging that the northern part of said State of Missouri was obtruded on and claimed by the defendant, ■for a space of more than ten miles -wide. and about two hundred miles long; and that the State of Missouri is wrongfully ousted of her jurisdiction over said territory, and obstructed from governing therein; that the State of Iówa has actual possession of’the same, claims it to be within her limits, and exercises jurisdiction over it, contrary to the rights of the State of Missouri, and in defiance of her aixthority.
 

 . And the complainant prays, that, on a final hearing, the northern boundary-line .of said State of Missouri (being the common boundary between the complainant and defendant) be, by the order of this court, ascertained and established ; and that the rights of possession, jurisdiction, and sovereignty to all the territory in controversy be restored to the State of Missouri ; that she be quieted in her title thereto; and that the. defendant, the State of Iowa, be for ever enjoined and restrained from disturbing the State of Missouri,, her officers and people,
 
 *667
 
 in the full possession and enjoyment of said territory, thus wrongfully held by the State of Iowa.
 

 To this bill the State of Iowa answers. She denies the right claimed by Missouri; alleges that Iowa has the sovereign authority, to govern and hold the territory in. dispute as part of her territory, the common line dividing the States bfeihg the southern part thereof; and also prays, that the rights of the parties may be speedily adjudicated by this court, that the relief prayed by complainant may be denied, and that he' bill be dismissed.
 

 To the bill of Missouri Iowa - files her cross-bill, charging,; Missouri with seeking to encroach on the. territorial limits, of Iowa to the extent aforesaid, and more ;. prays, that, on a final hearing, a decree be made by this court, settling for ever the trufe and rightful dividing line between the two States; that Iowa may be quieted in her possession, jurisdiction, and sovereignty up to the line she claims; and that the State of Missouri-be perpetually enjoined from exercising jurisdiction and authority, and from disturbing the State of Iowa, her officers and people, in the enjoyment of their- rights on the north side of the true line!
 

 To this bill , the State of Missouri answers, and sets up in defence the same matters set forth by her original bill.
 

 Replications were filed to both answers. On these .issues depositions were taken, on which, together with much of historical and documentary evidence, the 'cause was brought on to a hearing, and was heard with a most comméhdable spirit of liberality on both sides. And we take occasion here to say, on a matter of practice, that bill and cross-bill is deemed - the most appropriate mode of proceeding applicable to cases like the present, -as it always offers an opportunity to the court of making an affirmative decree for the one side or the other, and of establishing by its authority the disputed line, and of having it permanently marked by commissioners of its own appoint-, ment, if that be necessary, as in this cause it is.
 

 The present controversy originated in 1837, between the-United States and the State óf Missouri, and was'carried on for ten years before Iowa was admitted as a State. Previous to the controversy, and after Missouri came into the Union, in 1821, many acts had been done by both parties most materially affecting the controversy, and tending to coihpromit the claims now set up, on the one side as well as the other. The new State of Iowa came into the Union, December 27, 1847, and up to this date she was bound by the acts of her predecessor, the United States, forasmuch as the latter might have directly conceded to Missouri a new boundary on the north, as was done on the west; and so, likewise, Iowa is bound by the
 
 *668
 
 acts and admissions of the United States, tending indirectly to •confirm and establish a particular line as the northern boundary of Missouri. And to ascertain how far the United States government was committed by acts to a particular line, a brief historical notice is necessary, showing how jurisdiction has been exercised in the country west of the Mississippi River. It was acquired in 1803, and in 1804 the Territory of Orleans and the District of Louisiana were divided, the latter then embracing what is now the State of Missouri, and much more. In 1805, the District of Louisiana was erected into a separate territorial government, the name of which was changed to Missouri, on the State of Louisiana being created, in 1812, that State having adopted the name of Louisiana. Ip 1819, the Territory of Arkansas was formed from the southern part of the Missouri Territory; the lines of division being the same that now divide the States of Missouri and Arkansas.
 

 In 1818, the inhabitants of Missouri Territory petitioned Congress that it might be admitted into the Union as an independent State. They set forth the boundaries which they desired that the new State should have, with the reasons favorable to the boundaries desired. They alleged that the petitioners resided in that part
 
 of the
 
 territory .which lies between thirty-six degrees and thirty minutes’ and forty degrees north;, and between the Mississippi River east, and the Osage boundary-line
 
 west;
 
 and they prayed to be admitted into the Union of the States within these limits. The petitioners further declared, that “the boundaries which they solicit for the future State they believe to be' the most reasonable and proper that can be devised. The southern limit will be an extension of the line that divides Virginia and North Carolina, Tennessee and Kentucky.' The northern will correspond nearly with the north limit of the- territory of Illinois, and
 
 with the Indian boundary-line, near the mouth of the River Des Moines.
 
 A front of three- and a half degrees upon the Mississippi will be left to the South, to form the Territory of Arkansas, < with the River Arkansas traversing its centre. A front of three and a half degrees more, upon a medium depth of two hundred miles, with the Missouri River in the pentre, will, form the State of Missouri. Another front of equal extent, embracing the great River St. Pierre, will remain above, to form another State At some future day. The boundaries, as solicited, will include all the country to the north and west to which the Indian title has been extinguished. They will include the body of the population.”
 

 The two Indian boundary-lines referred to (as. “ the Osage or Indian boundary”) were run in pursuance of a treaty made
 
 *669
 
 in. 1808,. bet ween the United States and the Great and Little Osage nations, by which it was stipulated that the Osage boundary should begin at Fort Clark, standing on the south bank of Missouri River, about twenty-three miles below the. mouth of the Kansas, thence running due south to the Arkansas River, and with it to its mouth; thereby ceding to the United States all lands lying east of said line, and north of the southwardly bank of the Arkansas. The treaty also ceded “all lands belonging to the Osages situated northwardly of the River. Missouri.” The boundary-lines were to be run and marked as soon as the circumstances and convenience of the parties would permit. And the Great and Little. Oságes promised to depute two chiefs from their respective nations to ac-; company the commissioner or' commissioners who might be appointed by the United States to settle and adjust the said boundary. The . war of 1812 seems to have hindered a survey of the. lines, as, in 1815, by another treaty, peace was reestablished between the contracting parties, and former treaties were renewed, and in 1816 John C. Sullivan was sent by the-United States to run the-lines north of the Missouri. River. The Osages, by the treaty of 1808, having surrendered all claim to territory north of the Missouri River, it became necessary that -they should show to the United States what part of that country they owned, so that it might be separated, by a defined boundary, from other- Indian territories. Sullivan, the surveyor, commenced his first line on the north bank of the Missouri, opposite to the middle of the mouth of ithe Kansas, and ran north one hundred miles, made a corner, and then ran east to. the River • Des Moines, about one hundred and fifty miles more, west of the first line, and north of the second.. The entire country was then claimed, and partly occupied, by different nations of Indians. In 1816, also, Joseph 0. Brown ran. the line from Fort Clark south, to the Arkansas River, in execution of the. treaty of 1808. And the lines run by Browh and Sullivan are “the Indian boundary” referred to in the foregoing petition of the inhabitants of Missouri Territory.
 

 In March, 1818, the petition was referred to a select committee ; and on March. 6th, 1820, an act of Congress was passed, pursuant to the petition, authorizing the people of Missouri Ter-, ritory to form a constitution and. State.government within the limits designated by the act; that is to say, — “ Beginning in the--middle of the Mississippi River, on the parallel of thirty-six degrees of north latitude ; thence west along the said parallel of latitude to the St. Francis River; thence up and following the course of that river, in the middle of the main channel ■ thereof, to the parallel of latitude of thirty-six degrees and'
 
 *670
 
 thirty minutes; thence west along the same to a point where the said .parallel is intersected by a meridian line passing through the middle of the mouth of the Kansas River, where the same empties into the Missouri River; thence, from the point aforesaid, xibrth along' the said meridian line, to the intersection of the parallel of latitude which passes through the rapids of the River .Des Moines, making said line correspond with the Indian bdundary-line; thence east from the point of intersection last aforesaid, along the said parallel of latitude,' to the middle of the channel of the main fork of the said River Des Moines; thence down along the middle of the main channel of the said River Des Moines to the mouth of the same, where it empties into the Mississippi River; thence due east to the middle of the main channel of the Mississippi River; thence down and following the course of the Mississippi River, in the middle of the main channel thereof, to the place of beginning.”
 

 According to this law, the people of the Territory, in 1820, proceeded to form a constitution, by which the boundary prescribed by the act* of Congress was adopted; and by resolution of March 2, 1831,'the State was admitted to enter the Union on certain conditions, to which she assented in June, 1821. On the north and west, as already stated, the new State bordered on Indian territory, over which the general government exercised that modified jurisdiction which existing Indian rights would allow,-and had the exclusive power to extinguish the Indian title. The boundaries were therefore common :to the two governments, and the acts of either, when exercising jurisdiction with respect .to the common boundary, become proper subjects of consideration in the present controversy, as either government might bind itself to a practical line, although not a precisely true one, within the foregoing description. And in pursuing this branch of the subject, our first inquiry will be, how far the general government has committed itself to the old Indian boundary. Its action has .been, first,, through the Indian department; secondly, through1 the surveyor’s department ; and thirdly, by the exercise of civil jurisdiction in the territorial form of government on the north of Sullivan’s libe, embracing the territory now in controversy.
 

 And;- first, as to Indian treaties. The earliest one materially bearing on the question was that of August. 4, 1824, with the Sac and Fox tribes. They ceded to the United States all the title and claim that they had to any lands within the limits of the State of-Missouri, “which are situated, lying, and being between the Mississippi and'Missouri Rivers, and a line
 
 *671
 
 running from the Missouri, at the entrance of the Kansas River, north one hundred miles to the northwest corner of the State of Missouri, and from thence east to the Mississippi; reserving to. the half-breeds of said tribes the small tract in the fork between the Mississippi and Des Moines Rivers, and south of thé said line.” The Indian tribes admitted that the land east and south of the given lines belonged to the United States, and that none of their people should be permitted to settle or hunt on it. Although the Usages had, in part, ceded the same country in 1808, still the Sacs'and Foxes set up a claim to part of it, and the treaty of 1824 was made to quiet their claim;
 

 June 3, 1825, the . Kansas tribe also ceded to the'United States all claim they had to any lands in the State of Missouri, and further ceded and relinquished all other lands which they then occupied, or to which they had title, or claim, “lying west of the said State of Missouri, and within the following boundaries: beginning at the entrance of the Kansas into ■the Missouri River; from thence north to the northwest corner of the State of Missouri,” thence north and west. .Of course, the northwest corner here referred to was the one made by Sullivan in 1816, as none other was then claimed by Missouri herself, nor kno wn to the United States or the .Indians.
 

 In February, 1831, the State of Missouri, by a memorial from the legislature to Congress, petitioned the United States for an addition of the country west of the line running from the mouth of the Kansas north, and between said line and the Missouri River, alleging that it was a small slip .of land that had been acquired, by the treaty of June 3d, 1825, from the Kansas Indians. The petition declared, that the line from the mouth of the Kansas north was about one hundred miles long; that the country was settled, and rapidly settling, to its utmost verge; and that, as the Missouri River was the only great highway of this region, and could not be reached through a country inhabited by Indians, and being without roads, a cession of it to that State was necessary and proper!
 

 June 7, 1836, Congress acceded to the request of Missouri, and granted to-that State all' jurisdiction over the lands lying between iis then western line and the Missouri River, making the river the western boundary. But the accession was not to take effect until-the Indian title.to the country was extinguished.
 

 By the treaty of July 15, 1830, ten confederated tribes conjointly ceded a large tract of country to the United States, the boundary of which began near the head of the Des Moines River, and passéd westwardly to the north of the principal rivers falling into the Missouri; and down Calumet River to the'Missouri, and down the same to the Missouri State line at the
 
 *672
 
 piouth of the Kansas; thence along said State line to the northwest corner of the State ; and then northwardly and eastwardly various courses to the place of beginning. And within this boundary the tribes were to be located and superintended by the United States, pursuant to a policy now generally prevailing, and by which the Indians east' of the Mississippi River have been removed west of it. By this treaty, the neck of land between the Missouri River, and the then western line of Missouri was appropriated for the benefit of these tribes. To remove this impediment, and gratify the request of the State to have her limits enlarged, a treaty was made on the 17th of September, 1836, with the Iowas,, Sacs, and Foxes, reciting the facts, so far as the Indians were interested, and also that it was desirable and necessary that the country should be attached to the State of Missouri; and thereupon these Indian tribes (being part of the ten) did cede and relinquish to the United States all their right and interest to the lands lying between the State of Missouri and the Missouri River; and the- United States were exonerated from the guaranty imposed on them by the treaty of 1830, known as the Treaty of Prairie du Chien. And on the 27th of September, 1836, another band of the Sac and Fox tribes made, a similar cession. And on the 16th of October, 1836, various, bands of the Sioux, by another treaty, also assented to the cession, but in more definite terms: they gave a‘quitclaim to the United States of their interest in. the lands “lying between the State of Missouri and the Missouri River, and south of a line running due west from the northwest corner of the State to the Missouri River.” The country having been disencumbered of the Indian title, the President, by. proclamation of March 28, 1837, declared that the act of Congress of June 7, 1836, should take effect and thereby the ceded territory became a part of the State of Missouri.
 

 There are, in all, fifteen Indian treaties referring to the Osage boundary of 1816, as run by Sullivan, each of which recognizes that boundary as the Missouri State line ; and all of which treaties were made after Missouri was admitted into the Union, and before Iowa became a State. And as the treaties were drawn by authority of the United States, they must be taken as recognitions, on the part of the general government, that the Missouri boundary and the old Indian boundary are,,identical.
 

 In the second place, it is proper to ■ inquire how far the general government has recognized the Indian boundary-line of 1816- in its land department. By the act of February 17, 1818, the Howard District was established. This extended west to the old Indian boundary, and ran with it from the
 
 *673
 
 mouth of the Kansas. north, through its whole lengthy and thence east with Sullivan’s line to where it intersected the range line ten west from the principal meridian; extending on the east line about four fifths of its length.
 

 In 1823 this district was divided, and a western one established fronting on the two lines.
 

 To the eastern part of Sullivan’s line, next to the Des Moines Riv.er, the St. Louis District extended until 1824: when the Salt River District was established, running west to the range line between ranges 13 and 14; thence north to the-northern boundary-line of the State of Missouri; thence east with the State line. to the. River Des Moines, and down the same with the State line.
 

 By the act of August .29,1842, the western land district was divided, and that part of it lying north of the Missouri River ,had attached to it the Platte country; that is to say, the country annexed to Missouri by the act of Congress o 1836, lying west of the old.Indian boundary, and next to the Missouri River.
 

 When acting through the surveyor’s department of public, lands, on the Missouri side, the general government has never, recognized on the north, nor, until the Platte country was attached, on the west, any boundary as belonging to that State other'than the two Indian lines run by Sullivan in 1816, so far as they extended.
 

 The country north of the State of Missouri was for a time - attached to the Territory of Michigan, and then to the Territory of Wisconsin. By the act of June 12, 1838 (ch. 96), it was formed into a separate territorial government, by the name of Iowa. And by another act qf the same date (ch. 100), the territory was formed into two land districts; the southern one embracing the country in dispute.
 

 And on the Iowa side, the public surveys were executed, and lands were sold, up to Sullivan’s northern line. 'Nor had the Surveyor-General of Illinois and Missouri any jurisdiction to go beyond it north; nor the surveyor’s department of Iowa, to cross it by surveys to the south. From the time that Missouri became a State.to this day, Sullivan’s line has been recognized by the United States as the true northern boundary of Missouri, so far as it could be done through the department of public lands.
 

 And thirdly, Congress, as early as 1834, organized a territorial government bounded by said line; laid off counties bounded by it on the south, as early as 1836; and governed the territory for ten years up to that line, — all the time recognizing it as the proper northern boundary of Missouri.
 

 
 *674
 
 From these facts it is too manifest for argument to make it more so, that the United States were committed to this line when Iowa came into the Union. And» as already stated, Iowa must abide by the condition of her predecessor, and cannot now be heard, to disavow the old Indian line as her true southern boundary.
 

 The State of Iowa, by her cross-Bill, alleges that Missouri also treated the old Indian bop^d&ry as her true northern line, until about the year 1836; and that said line, at its western, extremity, is about six miles north of the parallel of latitude which is the proper dividing line between the two States, and that, at its eastern extremity,' it is about ten miles north of the same; that the parallel of latitude on which the line should run is found at a point opposite the
 
 middle,
 
 of the rapids in the Mississippi River, known as
 
 “
 
 the Des Moines Rapids.” This rapid begins about three miles above the mouth of the Des Moines River, and extends up the Mississippi about fourteen miles. It is a highly notorious geographical object, and a very proper one to govern a national boundary; but the name called for in the act of Congress of 1820, and in the constitution of Missouri, is “the rapids of the River Des Moines.” Then, and ever since, the great rapid in the Mississippi River has befen known by a different name. It is therefore left uncertain whether the rapid in the Mississippi was the one referred to; and the obscurity is greatly increased by a most embarrassing disagreement among the witnesses testifying on this head.
 

 The name given in the act of Congress, taken in connection with its context, would assuredly apply to a rapid in the Des Moines River, if a notorious one existed, as the Mississippi River is not mentioned in the call, and the Des Móines is; nor was the Mississippi River to be reached by that line. Then, again, the rapid is fourteen miles long, and no part of it is called for as an opposite point to found the line upon.
 

 It therefore, follows, that the claim of Iowa, to come south to the middle of the rapid throws us on a doubtful and forced construction of the instrument under consideration; and such a construction we are not willing to adopt, even if Iowa .could at this day set up a claim 'to its adoption, which, for the reasons above stated, we think she cannot be allowed to do.
 

 The State of Missouri, by her bill, disavows the old Indian boundary, and utterly denies that the great Des Moines rapid in the River Mississippi is. the object called for in her constitution. She insists that the true rapids are found in the. Des Moines, and that her northern line has been run and marked
 
 *675
 
 from the trae rapids, west to the Missouri River. The history of this line is as follows: — In December, 1836, the legislature of Missouri passed an act requiring the northern boundary of that State to be surveyed and marked under the direction of the executive.; and in June, 1837, the governor appointed three commissioners to execute the law, who acted under special instructions from the "executive. The commissioners appointed Joseph 0. Brown their engineer and surveyor, and commenced the work in July following; and after having examined the Des Moines, from a point nearly one hundred miles up the river, downwards to its mouth,- to ascertain the true rapids called f6i in the State constitution,' determined on the proper place where,, in their judgment, the line should begin; and from that place the line was run and marked due west to the Missouri' River; and this is known as Brown’s. line. It.lies about ten miles-north of the old Indian boundary. • And, by ah act of the legislature of Missouri, passed 11th February, 1839, the line so run and marked by Brown was declared to be the northern boim- ' dary-line of said State, and has been claimed by her as such ■ since that time.
 

 On the rapids selected by .the commissioned, and on Brown’s line, the bill of complaint of the State of Missouri is altogether founded; and if she fails in establishing the proper place of beginning, she has no case, and must go out of court 1 as a complainant, and can have no relief further than an injunction to restrain Iowa from obtruding on her jurisdiction south of the true line, wherever it may be found, should Iowa attempt to go south of such line.
 

 The main question arising on the original bill of the State of Missouri therefore is, whet aer -any rapid exists in the Des Moines River of such a prominent character as to correspond to the call in her constitution of “ the rapids op the River Des Moines.” On this branch of our inquiries we are furnished with highly satisfactory evidence. By the act of August 8, 1846, the Iowa. Territory had granted to it, by Congress, every _ alternate section of land, not then disposed of, lying in- a strip of five miles wide on each-side of the Des Moines River, for the improvement of the same from its mouth to a long distance up, and which grant was to accrue to tne benefit of the State when she should come into the Union. To carry into effect the act of Congress, a board of public works was organized for the improvement of the river. They employed an engineer to survey and level it with a’view to slack-water improvements, and it was surveyed from its mouth for ninety-three miles up-, wards.- The engineer had every advantage of suitable instruments, low water, and ice in the winter, and no doubt, exists of
 
 *676
 
 ¡bis accuracy when performing the field operations and in making the levels.
 

 . The first ripple he carné to, worthy of notice here, was twenty-four miles from the mouth of the river; and, on eighty rods of its greaftest descent, he found .73 foot fall.
 

 On the 26th mile is “Sweet-home Ripple.” There was found a fall of .86 foot in eighty rods.
 

 On the 34th mile, at Farmington, he found a fall of 2.27 feet in ninety-six rods, and in eighty rods 1.89 feet.
 

 On the 42d mile, he found a ripple (near Benton’s Port) of 1.26 feet fall in sixty rods, and 1.68 in eighty rods.
 

 . On the 61st mile, being at the great bend, where Brown’s line commences, the engineer found a fall of 1.76- feet in eighty rods, — that is to say, twenty-one inches. Brown had also taken a level there of a space of some sixty rods, in August, 1837, and found a fall in that distance of 1 foot 9§ inches; but his instruments were not so reliable. The bottom of the river is rock at that place, and there is a thin stratum at. one point, over which the water breaks when the river is low.
 

 On the 63d mile, a fall was found in eighty rods of 1.75 feet by the engineer of Iowa.
 

 On the 56th mile, a fall of 1.81 feet was found in eighty rods.
 

 On the 93d mile, a fall was found in eighty rods of 2.10 feet.
 

 A line extended due west from this greatest fall would lie about twenty miles north of Brown’s line, the river being very crooked. From this point downwards, it was examined by the commissioners of Missouri in 1837.
 

 The shoals on the 34th mile, at Farmington, on the 42d, at Benton’s Port, and at the great bend at Yan Burén, on the 61st mile, where Brown’s line begins, and the descents on the 53d and 55th miles, are of about equal magnitude; neither reach to so much as two feet ascent in eighty rods, and are not perceptible at all when the,*water is three feet higher than when at its lowest stage in dry weather. In 1820 these shoals were nameless, and are so slight that some of them are now nearly obliterated by the accidents of dams thrown across the river for milling purposes. Either one of the five might have been selected by the commissioners of Missouri for the proper place of beginning with almost equal propriety. They searched the river from the Appannoose Fall, at the 93d mile, to its mouth, in a pirogue, before they selected their starting-point, obviously depending on such examination for a selection of the particular place of beginning, and not on any notorious rapid pointed out by public reputation. There is none such in the Des Moines River, and therefore Brown’s line cannot be upheld, nor the claim of Missouri be supported.
 

 
 *677
 
 This court is, then, driven to that call in the constitution of Missouri which declares that her Western boundary shall correspond with the Indian
 
 boundary-line;
 
 and, treating the western line of a hundred miles long as a unit, and then running east from its northern terminus, it will supply the' deficiency of a call for an object that never existed. Nor has Missouri any right to complain. She herself, for ten years and more after coming into the Union, recognized the Indian lines west and north as her proper boundary; her counties were ^tended up to these, lines before,1 the present controversy arose•. and so counties in the territory north were established up to this recognized line without objection on the part 6f Missouri. And when Congress ceded to Missouri the country west of Sullivan’s line, both parties to that cession acted on the assumption, that the cfeded territory next the Missouri River whs bounded on the north -by a line that should be run due west &om the northwest corner of the old Osage boundary. To this extent the Indian title was extinguished, and to no other extent did the United States cede that country. -Nor could this court act otherwise than to reject,, the claim of Missouri, without doing palpable injustice to the United States on the western part of the line:
 

 We are, therefore, of opinion, that tlie northern boundary of Missouri is. the Osage line, as"run by- Sullivan in 1816, from .the northwest corner made by him, W the Des Moines River; and that a line extended due west from said northwest comer to' the Missouri River is the prpppr. northern boundary on that end of the line. • And this is the unanimous opinion of all the judges of this court.
 

 Decree.
 

 On this 13th day of February, A. D. 1849, the cause of the State of-Missouri against the Staté of Iowa, on án original bill, and also on a cross-bill of the State of Iowa against the State of Missouri, constituting part of said cause, -came on to be heard before the honorable the judges of the Supreme Court, of :the United States in open court, all of the judges of said court being present. And said cause was heard on the original bill, mid the answer thereto, and the replication to said answer; and also on said cross-bill, and the answer thereto, and the replication to said answer; and on the proofs in said caüáe, consisting of depositions; documents, and historical, evidences; when it appeared to the court, that, in tne year i£ 16, the United States caused to be run and marked two lines, as part of a boundary between the United States and the Great and Little Osage nations of Indians, in execution of a treaty made
 
 *678
 
 with said Qsages in 1808, the first line of the tw& beginning on the eastern bank of the Missouri River, opposite the middle of the mouth of the Kansas River, and extending north one hundred miles, where a corner was made by John C. Sullivan, the surveyor and commissioner, acting on behalf of the United States and the Osage'nations; and that from, said corner a second line was then run and marked by said surveyor, under said authority, which was intended to ,be run due east, oh a parallel" of latitude, but which line, by mistake, varied about . two and one-half degrees towards the north of adpe east and west line. And. it.further appeared, that the first-named line is the one to which the descriptive call in the constitution of the State of Missouri refers as the, Indian boundary-line, and to which the western boundary of said State was to correspond." And it also appeared, that said two lines had, at all times since Missouri came into the Union as a Státe, been recognized by the United States as the true western and northern boundaries of the State of Missouri, as called for - in her constitution; and that the State of Missouri had also recognized these lines as a part of her b( undary for the first ten years of her existence, if not more;.but that, in .the year 1837, she caused another line to be run, and marked as her northern boundary, from the River Des Moines due west to the Missouri River, lying about ten miles north of said line run by Sullivan in 1816, which line of 1837" embraced part of a territory then governed by the United States, and which.was inhabited by citizens of the United States, and which territory continued to be so governed by the United States until the 29th day of December, 1846, when the jurisdiction over the same was conferred upon the State of Iowa. It further appeared, that the State, of Missouri claims to exercise jurisdiction up to said line, as fun and marked in the year 1837, on an assumption that the descriptive call in her constitution for a parallel of latitude “ passing through the rapids of the River Des Moines ” was gratified by a rapid found in said river, at a place known as the Great Bend, and from which said line was begun qnd extended west. And this court finds that there is no such rapid in the River Des Moines as that called, for in the constitution of the State of Missouri; and that she was not justified in causing the line run and marked in 1837 to be extended as her northern boundary.
 

 And the court further finds, that the State of Iowa is estopped from setting up claim to a line south of the old Indian boundary, known as Sullivan’s line, as said State," by her cross-bill, assumes to do; because her predecéssor, the United States, by many acts, and by uniform assumptions, up to the time when
 
 *679
 
 Iowa was created, in December, 1846, recognized and adopted Sullivan’s line as the proper northern boundary of the State of Missouri;, and that the .State of Iowa is bound by such recognition and adoption.
 

 And it further appeared, that that portion of territory lying west of Sullivan’s first line, and between the same and the Missouri River, was added to the State of Missouri by force of aft act. of Congress of June 7th, 1836, which took effect by the President’s proclamation of March 28th, 1837; and that a line prolonged due west from. Sullivan’s northwest corner, on a parallel of latitude, to the middle of the Missouri River, is the true northern boundary of the State' of Missouri, on this part of the controverted boundary.
 

 And this court doth therefore see proper to decree, and doth accordingly order, adjudge, and decree, that the true and proper northern boundary-line of the State of Missouri, and the true southern boundary of the State of Iowa, is the line run and marked in. 1816, by John C- Sullivan, as the Indian boundary, from the northwest corner made by said Sullivan, extending eastwardly, as he run and marked the said line, to the middle of the Des Moines River; and that a line due west from said northwest corner to the middle .of the Missouri River is the proper dividing-line between said States west of the aforesaid corner; and that the States of Missouri and Iowa are bound to conform their'jurisdictions up to said line on their respective sides thereof, from the River Des Moines to the River Missouri.
 

 And it is further adjudged and decreed, that the State of Missouri be, and she is hereby, perpetually enjoined and restrained from exercising jurisdiction north of the boundary aforesaid dividing the States; and that the State of Iowa be, and she hereby is, also perpetually enjoined and restrained from . exercising jurisdiction south of the dividing boundary' established by this decree.
 

 Ánd’it is further ordered^that Joseph C. Brown, of the State of Missouri, and Henry B. Hendershot, of the State of Iowa, be, and they are hereby, appointed commissioners to find and re-mark the line run by said Sullivan in 1816, extending east-wardly from said northwest corner to the Des Moines River; and especially to find and establish said northwest corner, and to mark the same as hereinafter directed; and also to run aline due west, on a parallel of latitude, from said comer, when found, to the Missouri River, and to mark the same as hereinafter directed.
 

 And said commissioners are hereby commanded to plant at said northwest corner a cast-iron pillar, four feet six inches
 
 *680
 
 long, and squaring twelve inches at its case, and eight inches at its top; such pülar to be marked with the word “ Missouri” on its south side, and “ Iowa ” on the north, and “ State Line ” on the east side ; which marks shall be strongly cast into- the iron. And a similar pillar shall be by them planted in the line near the bank of the Des Moines River, with the mark of “ State Line” facing the west. And also a similar one, near the east bank of the Missouri River, shall be planted b,y thé said commissioners in the said line, the mark of “State Line ” facing the east.
 

 And it is further ordered, that pillars or posts, of stone or of cast-iron, shall he planted at every ten miles in the line extending east, from the northwest corner aforesaid to the Des Moines River; and also at the end of every ten miles on the dué west line, extending to the Missouri River from said corner. . These latter line-posts ,to be of such description as the commissioners may adopt, or as the parties to this suit, acting jointly, may direct the commissioners to use,.except that said line-posts shall be of stone or iron.
 

 • And it is . further ordered, that a duly certified copy of this, decree shall be forwarded to the chief magistrate,of the State of Missouri, forthwith,’by the .clerk of this court; and. that a similar copy shall, in like manner, be forwarded to the chief magistrate^ of the State of IowaV. And the" commissioners of this court hereby appointed are directed to correspond with said chief magistrates respectively, through their secretaries of state, requesting the cooperation, and assistance of the State authorities in the performance of the duties imposed on said commissioners by this decree.
 

 And it is further ordered, that the clerk of this court forward to, each of the said commissioners a copy hereof, duly authenticated, without delay.
 

 . And it is further ordered, that said commissioners inaké report to this court, on or before the first day of January next, of their proceedings .in the premises, with a bill of costs and charges annexed.
 

 And it is further ordered, that, should either of said commissioners die, or tefuse to act, or be' unable to perform the duties required by this decree," the chief justice .of this court is hereby authorized and empowered to appoint other commissioners to supply vacancies; and, if it be deemed advisable by the chief justice, he may increase .the. commissioners, by appointment, to more than two ; and he is authorized to .act'on such information in the premises as may be satisfactory to himself.
 

 And should any other contingencies arise in -executing this
 
 *681
 
 decree, the chief justice, in vacation, is further and-generally authorized to make' siifch orders and give such instructions as this court could do when in session. Copies of all orders and instructions and acts done in the premises by the chief justice shall be filed by the clerk of this court,, together with the petitions, papers, and documents on which they are founded. And reports of the commissioners, if made in vacation, shall be filed with the clerk also, for safe-keeping thereof, until presented in open court for its action thereon.
 

 And it is further ordered and adjudged, that the costs of this suit, including the original bill,, cross-bill, and the proceedings thereon, and alt costs incident to establishing and marking the dividing line, and all other costs and charges of every description, shall be paid by the States of Iowa and Missouri equally*
 

 In the case of Missouri
 
 v.
 
 Iowa, and of Iowa
 
 v.
 
 Missouri, in the Supreme Court of the United States:
 

 Having received information of the death of Joseph C. Brown, one of the commissioners appointed by the decree of the Supreme Court in the above-mentioned cases to run and mark the boundary-line between the States of Missouri and Iowa, I hereby, pursuant to the duty enjoined upon me by the said decree, appoint Robert W. Wells, of the State of Missouri,'a commissioner for the purposes aforesaid, in the place of the said Joseph C. Brown, deceased.
 

 R. B. TANEY,
 
 Chief Justice of Supreme Court of U. S.
 

 Baltimore,
 
 April
 
 6,1849.