WOODLAND and Wife *v.* NEWHALLS' ADM'R and others.

*(Circuit Court, W. D. Virginia. 1887.)*

1. JUDGMENT—RES ADJUDICATA.
    Where a suit to recover a sum of money, claimed as a legacy, has been dismissed on general demurrer, it cannot be pleaded in estoppel to a bill by the same party for the same sum, claimed under a trust, especially where new defendants are joined, and the record entry dismissing the suit specifies as grounds therefor only "reasons appearing to the court." [1]

2. SLAVES—CONTRACTS.
    All agreements, contracts, trusts, and instruments to which a slave is a party are null and void. If not emancipated, it matters not what efforts have been made for freedom, or what privileges are enjoyed.

3. SAME—ABOLITION OF SLAVERY.
    Slavery was abolished in Virginia by the Alexandria constitution, adopted April 7, 1864.

4. CONTRACT—FOR BENEFIT OF THIRD PERSON.
    If two persons, for a valuable consideration as between themselves, covenant to do something for the benefit of a third person, who is a stranger to the consideration, the latter cannot enforce the covenant. [2]

In Equity.
*Edmunds & Lewis,* for plaintiffs.
*Kean & Kean,* for defendants.

[1] Respecting the effect of a judgment of dismissal not on the merits, see Kirkpatrick v. McElroy, (N. J.) 7 Atl. Rep. 647, and Walker v. Wise, (Ga.) 2 S. E. Rep. 749, and note.

[2] Respecting the enforcement of contracts in actions by third parties, see Wright v. Terry, (Fla.) 2 South. Rep. 6, and note.

PAUL, J. This is a suit in equity, brought January 22, 1885, by Elizabeth Woodland, formerly Elizabeth Penn, and her husband, John Woodland, against M. C. Newhall's administrator and others, for the purpose of subjecting the estate of said M. C. Newhall, deceased, to the payment of the sum of $1,000, with interest thereon from the first day of July, 1871, which amount is alleged to be due the female complainant. The plaintiffs base their claim on the following facts, as set forth in the bill. They are not denied in the answers, and are sustained by the evidence taken in the cause.

In the year 1857 or 1858, Paulina Isbell, the mother of the female complainant, was the slave of William Isbell, of Amherst county, Virginia; that said Paulina managed to save a considerable sum of money, which money she had accumulated by degrees, for the purpose of purchasing the freedom of herself and little daughter, the female plaintiff in this suit; that the said sum of money was placed in the hands of one M. C. Newhall, a citizen of Lynchburg, Virginia, upon the understanding and agreement that he, the said Newhall, would purchase freedom for her, the said Paulina, and her child; that the said Newhall, accepting the trust thus agreed upon, purchased the liberty of said Paulina Isbell and her said child from their former master, William Isbell; that the law, as it then was, forbade a slave set free to remain in Virginia, and the said Paulina, not wishing with her child to leave the state, applied to said Newhall to have the title to them as slaves made out to himself. To this the said Newhall assented, and agreed to stand in the place of owner and master to them, with the full right and privilege reserved by them, and agreed to by himself for them, to do as they pleased, just as freeborn citizens, which privilege they ever after exercised without let or hinderance, the said Newhall laying no claim to any power over them, and always ready and willing to release his bare title, whenever they should so desire; that under this state of things the said Paulina Isbell accumulated the sum of $1,000, and placed the same in the hands of said M. C. Newhall, in trust to buy her a house and lot; that the said Newhall accepted this trust, and, when the opportunity offered, bought a house and lot accordingly for the said Paulina Isbell, but, on investigation, finding the title defective, annulled the purchase.

About the year 1861 or 1862 the said Paulina Isbell died before said Newhall had consummated the trust assumed by him, but he all the time acknowledged the trust, and after her death he kept an account of his indebtedness to "the estate of Paulina Isbell," as shown by the index to his book; but the account itself has been destroyed by the leaves on which it was kept being cut from the book. Said M. C. Newhall made his will on the twentieth day of March, 1865, in which he gave his estate, a large one, to his two nephews, Harrison Sublett and Charles M. Sublett. This will was admitted to probate in the hustings court of the city of Lynchburg on the third day of April, 1865, and Charles M. Sublett qualified as the executor thereof.

On the same day that said M. C. Newhall made his will, to-wit, March 20, 1865, he executed a paper witnessed by John Boisseau, (Exhibit B,

filed with bill in this cause,) in which he gives the following directions to his two nephews, the legatees in his will: "*To my Nephews Charles M. and Harrison Sublett:* Having entire confidence in you, I wish you to carry out this, my will in fact." After directing the payment of certain sums to two of his relatives, and $1,000 to Betsy Fletcher, he says: "Pay to Lizzie Penn one thousand dollars, ($1,000.) I give this in consideration of the amount I owe her mother, which is on my books. Set her free, and see that she has all her rights. These legacies must be paid in specie, or its equivalent."

It is admitted by all parties to this suit that this paper is not a testamentary document. In pursuance of the directions given in this paper, Charles M. Sublett paid to the guardian of said Lizzie Penn, or those having charge of her, the interest on the said sum of $1,000, to the first of July, 1871; and in several letters to her guardian he promises to pay the principal at an early day, stating that he had loaned out the money, and would pay it as soon as he collected it. But, failing to pay any further sum, on the twentieth of May, 1872, John Boisseau, as guardian and next friend of said Lizzie Penn, instituted a chancery suit in the circuit court of Danville against Charles M. Sublett, as executor of M. C. Newhall, deceased, and in his own right, and Harrison Sublett. To the bill in this suit a demurrer was entered, no other pleadings being filed on behalf of the defendants, which demurrer was at the June term, 1874, sustained, and leave given the plaintiffs to amend their bill. Nothing more was done in the cause until the November term, 1874, when this order was entered: "For reasons appearing to the court it is ordered that this suit be dismissed." Nothing further was done toward asserting this claim until the institution of this suit.

The answers filed by the defendants state the following principal grounds of defense: (1) That the plaintiffs are estopped in asserting their demand by the result of the suit in the state court at Danville in 1873–74; that the matters involved in this suit are *res judicata.* (2) That all of the transactions, contracts, agreements, etc., made and had between said Paulina Isbell and said M. C. Newhall, as well as the paper dated March 20, 1865, directing the payment to Lizzie Penn of the sum of $1,000, are null and void, because the said Paulina and the said Lizzie were at the time of said transactions slaves under the laws of Virginia. (3) That no trust was created for the benefit of the said Lizzie Penn, either by the transactions had between said M. C. Newhall and her mother, the said Paulina, or by the paper dated March 20, 1865, directing Charles M. and Harrison Sublett to pay her the sum of $1,000, and by the letters of said Charles M. Sublett, promising to pay said sum. (4) That, if the claim asserted by the plaintiff ever was a valid and binding claim against the estate of said M. C. Newhall, it is now barred by the statute of limitations.

According to the views of the court on the other grounds of defense, it is not necessary to consider the question of the statute of limitations. The other questions will be discussed in the order above stated.

An inspection of the record in the suit in the Danville circuit court is,

we think, sufficient to dispose of the question of estoppel. "The general rule of law is that the judgment of a court of law, or decree of a court of equity, directly upon the same point, and between the same parties, is good as a plea in bar, and conclusive when given in evidence in a subsequent suit." *Thompson* v. *Roberts*, 24 How. 233. The doctrine is thus stated in *Hopkins* v. *Lee*, 6 Wheat. 109: "A judgment or decree of a court of competent jurisdiction is conclusive whenever the same matter is again brought in controversy. But the rule does not apply to points that come only collaterally under consideration, or are only incidentally considered, or can only be argumentatively inferred from the decree."

The same principle is laid down in *Russell* v. *Place*, 94 U. S. 606:

"If, upon the face of a record, anything is left to conjecture as to what was necessarily involved and decided, there is no estoppel in it when pleaded, and nothing conclusive in it when offered as evidence."

In the same case it is said:

"When the same case [referring to *Packet Co.* v. *Sickles*, 5 Wall. 580] was before this court the second time, the general rule with respect to the conclusiveness of a verdict and judgment in a former suit between the same parties, when the judgment is used in pleading as an estoppel, or is relied upon in evidence, was stated to be substantially this: that to render the judgment conclusive it must appear, by the record of the prior suit, that the particular matter sought to be concluded was necessarily tried or determined; that is, that the verdict could not have been rendered without deciding that matter, or it must be shown by extrinsic evidence consistent with the record that the verdict and judgment necessarily involved the consideration and determination of the matter."

See, also, 1 Bart. Ch. Pr. 377, 379; 4 Minor, Inst. pt. 1, 719.

An application of the foregoing principles to this cause, we think clearly demonstrates that the proceedings had in the suit in the circuit court of Danville cannot be pleaded as an estoppel in this.

New parties, other than privies, are made defendants in this suit; and while the same amount of money is claimed in this suit as in that in the state court, and for the same plaintiff, the grounds of the claim are widely distinct. In the suit in the state court the claim was based on the allegations in the bill that the complainant, Elizabeth Penn, was a legatee under the will of M. C. Newhall, made so, not by the provisions of the body of the will, but by a separate and distinct clause, so attached that it could be separated from the body of the will; that the will was regularly probated, except the clause giving said complainant a legacy; and that this clause was withheld from the recorder when the body of the will was probated, and that it was then in the hands of Charles M. Sublett, executor of M. C. Newhall, and that it appeared nowhere else. The suit seems to have been brought in ignorance of the character of the paper called a "clause of the will," and of its legal effect. Neither plea nor answer was filed to the bill. The demurrer was a general one. It states no grounds for dismissing the bill, and there is nothing in the order of dismissal showing what questions going to the merits of the cause were passed upon and concluded. In the bill filed in the suit in the state court the complainant alleges that she was a slave at the time

the will giving her a legacy was made. In this suit the plaintiff claims that she was a free person at the time of the execution of the paper called in the suit in the state court a "clause of the will." She rests her claim for the $1,000, not on any provision or clause of the will of M. C. Newhall, not as a legacy due her, but on the ground that M. C. Newhall was a trustee for her mother, Paulina Isbell, and as such held in trust the sum of $1,000; that by the paper writing (Exhibit B) dated March 20, 1865, he recognized this trust, and directed it to be carried out for the benefit of the plaintiff, by his nephews, Charles M. and Harrison Sublett; that said Charles M. Sublett recognized this trust, and promised and bound himself to carry it into effect, and thereby became trustee of the said sum of $1,000, for the benefit of the plaintiff.

As to the question of the freedom or slavery of Paulina Isbell and her daughter, the plaintiff, there can be no question as to the civil *status* of the mother. She was a slave, and all of her efforts to secure her freedom did not change her condition in the slightest degree. No matter how much liberty she may have been allowed, nor what privileges common to free persons she may have been permitted to enjoy by M. C. Newhall, who purchased her from William Isbell, and stood in the place of her master and owner, she was equally a slave, and all the disqualifications and disabilities incident to that condition of servitude attached to her. The statute law of Virginia prescribed the means, and it was the only way, by which a slave could be emancipated. The provision of the Code was as follows: "Any person may emancipate any of his slaves by last will, in writing, or by deed duly recorded in the court of his county or corporation." Code Va. 1860, c. 103, § 16.

It follows that all agreements and contracts of any and every kind, between Paulina Isbell and M. C. Newhall, were null and void. She could neither contract nor be contracted with. Says Justice SWAYNE, speaking of a contract with a slave in *Hall* v. *U. S.*, 92 U. S. 27: "In the view of the law, it created no obligation, and conferred no rights, as to either of the parties. It was as if it were not." See *Bailey* v. *Poindexter*, 14 Grat. 132; *Stevenson* v. *Singleton*, 1 Leigh, 72; 2 Kent, Comm. 253.

It is needless to multiply authorities as to the incapacity of a slave to make any civil contract.

As to the civil *status* of the female plaintiff at the time of the making of the writing (Exhibit B) by M. C. Newhall, to-wit, March 20, 1865, which directs the payment to her of $1,000, by Charles M. and Harrison Sublett, while the decision of this question is not absolutely necessary to the determination of this cause, it being raised and discussed the court will pass upon it. It is the opinion of the court that her *status* was that of a free person. Article 4, § 19, of the constitution of Virginia, generally known as the "Alexandria Constitution," provided that "slavery and involuntary servitude, except for crime, is hereby abolished and prohibited in the state forever." This constitution was adopted April 7, 1864, and went into effect at the date of its adoption. The government making and adopting this constitution was recognized as the legal government of the state of Virginia by the national government.

"'This government," says Chief Justice CHASE in *Griffin's Case*, Johns. C. C. 412, "was recognized as the lawful government of Virginia by the executive and legislative departments of the national government, and this recognition was conclusive upon the judicial department. The government of the state then recognized was, in contemplation of law, the government of the whole state of Virginia, though excluded, as the government of the United States was itself excluded, from the greater portion of the territory of the state. * * *" Again he says, page 413, same report:

"Indeed, it is well proven historically that the state, and the government thus organized, were recognized by the national government. Senators and representatives from the state occupied seats in congress, and when the insurgent force which held possession of the principal part of the territory was overcome, and the government recognized by the United States was transferred to Richmond, it became in fact what it was before in law,—the government of the whole state. As such, it was entitled, under the constitution, to the same recognition and respect in national relations as the government of any other state."

See, also, *Virginia* v. *West Virginia*, 11 Wall. 39.

The validity of this constitution has never been judicially called in question. While it existed it was fully and completely recognized as the constitution of the state of Virginia. After the cessation of hostilities, under its provisions all the machinery of the state government operated. Elections were held to fill county and district offices. Representatives were chosen to the legislature in the manner and according to the districts prescribed by this constitution. Taxes were levied, judges were elected by the legislature, on the nomination of the governor, and, in short, all the affairs of government were conducted under this instrument,—the organic law of the state. It seems to the court that it would be an anomalous decision that should hold the Alexandria constitution to be valid and binding in all its provisions except that wherein it abolishes slavery.

The court is unable to arrive at the conclusion that it was the constitution of the state in all of its provisions except as to the abolition of slavery, and that that provision is an exception to its full and complete operation. This brings us to the only other point raised by the pleadings, and pressed in the argument, deemed by the court material to the determination of this cause on its merits; and that is, was there a trust created for the benefit of Elizabeth Penn, the female plaintiff in this cause, either by the transactions had between said M. C. Newhall and Paulina Isbell, the mother of the said plaintiff, or by the paper Exhibit B, dated March 20, 1865?

We have already shown that the transactions which took place between M. C. Newhall and the slave woman Paulina Isbell were entirely null and void. They created no legal obligation whatever on Newhall which will support a trust for the benefit of the child of the slave mother. Whatever moral obligation rested upon Newhall to make provision for this child, and he seems to have recognized that such did exist, it is not

an obligation that can be enforced in a court of equity. As to all contracts, rights, trusts, and obligations growing out of Newhall's transactions with the slave Paulina Isbell, they must fall to the ground as utter nullities.

As to the writing of March 20, 1865, (Exhibit B.) It was manifestly intended by Newhall as a will, or codicil to his will of the same date. He calls it his "will in fact." The executor, Charles M. Sublett, in one or more of his letters filed as exhibits with complainant's bill, speaks of it as the "will." He understood it to be such. Being null and void as a testamentary paper, for want of the requisite number of witnesses, does it create a trust for the benefit of Elizabeth Penn? "Uses or trusts, to be raised by any covenant or agreement of a party in equity, must be founded upon some meritorious or valuable consideration; for courts of equity will not enforce a mere gratuitous gift, (*donum gratuitum*,) or a mere moral obligation. Hence it is that, if there be a mere voluntary executory trust created, courts of equity will not enforce it." Story, Eq. Jur. § 973. See, to the same effect, Bisp. Eq. 101.

Were the court to construe the paper B, taken in connection with the letters of Charles M. Sublett, executor *c. d. e. f.*, as on its face declaring a trust, yet having no consideration, either valuable or meritorious, to support it, it cannot be enforced. "And upon the same ground, if two persons, for a valuable consideration, as between themselves, covenant to do some act for the benefit of a third person, who is a mere stranger to the consideration, he cannot enforce the covenant against the two, although each one might enforce it against the other." Story, Eq. Jur. § 973.

This is the doctrine at common law, and, though it has been modified by statute, (Code 1873, *c.* 112,) there was never any agreement between Newhall and the Subletts, or either of them, that can bring the female complainant within the provisions of the statute.

The bill must be dismissed upon the merits.