Mr. Justice MILLER
delivered the opinion of the court.
The first proposition on which counsel insist, in support of the demurrer is, that this court has no jurisdiction of the case, because it involves the consideration of questions purely political; that is to say, that the main question to be decided is the conflicting claims of the two States to the exercise of political jurisdiction and sovereignty over the territory and inhabitants of the two counties which are the subject of dispute..
This proposition cannot be sustained without reversing the settled course of decision in this court and overturning the principles on which several well-considered cases have been decided. Without entering into the argument by which those decisions are supported, we shall content ourselves with showing what is the established-doctrine of the court.
In the case of Rhode Island v. Massachusetts * this question was raised, and Chief Justice Taney dissented irovn the judgment of the court by which the jurisdiction was affirmed, on the precise ground taken here. The subject is elaborately discussed in the opinion of the court, delivered *54 bj7 Mr. Justice Baldwin, and the jurisdiction, we think, satisfactorily sustained. That case, in all important features, was like this. It involved a question of boundary and of the jurisdiction of the States over the territory and people of the disputed region. The bill of Rhode Island denied that she had ever consented to a line run by certain commissioners. The plea of Massachusetts averred that she had consented. A question of fraudulent representation in obtaining certain action of the State of Rhode Island was also made in the pleadings.
It is said in'that opinion that, “title, jurisdiction, sovereignty, are (therefore) dependent questions, necessarily settled when boundary is ascertained, which being the line of territory, is the line of power over it, so that great as questions of jurisdiction and sovereignty may be, they depend on facts.” And it is held that as the court has jurisdiction of the question of boundary, the fact that its decision on that subject settles the territorial limits of the jurisdiction of the States, does not defeat the jurisdiction of the court.
The next reported case, is that of Missouri v. Iowa* in which the complaint is, that the State of Missouri is unjustly ousted of her jurisdiction, and obstructed from governing a part of her territory on her northern boundary, about ten miles wide, by the State of Iowa, which exercises such jurisdiction, contrary to the rights of the State of Missouri, and in defiance of her authority. Although the jurisdictional question is thus broadly stated, no objection on this point was raised, and the opinion which settled the line in dispute, delivered by Judge Catron, declares that it was the unanimous opinion of all the judges of the court. The Chief Justice must, therefore, have abandoned his dissenting doctrine in the previous case.
That this is so is made still more clear by the opinion of the court delivered by himself in the case of Florida v. Georgia,† in which he says that “ it is settled, by repeated decisions, that a question of boundary between States, is *55 within the jurisdiction conferred by the Constitution on this court.” A subsequent expression in that opinion shows that he understood this as including the political question, for he says “that a question of boundary between States is necessarily a political question to be settled by compact made by the political departments of the government. . . . But under our form of government a boundary between two States may become a judicial question to be decided by this court.”
In the subsequent case of Alabama v. Georgia,* all the judges concurred, and no question of the jurisdiction was raised.
We consider, therefore, the established doctrine of this court to be, that it has jurisdiction of questions of boundary between two States of this Union, and that this jurisdiction is not defeated, because in deciding that question it becomes necessary .to examine into and construe compacts or agreements between those States, or because the decree which the court may render, affects the territorial limits of the political jurisdiction and sovereignty of the States which are parties to the proceeding.
In the further consideration of the question raised by the demurrer we shall proceed upon the ground, which we shall not stop to defend, that the right of West Virginia to jurisdiction over the counties in question, can only be maintained by a valid agreement between the two States on that subject, and that to the validity of such an agreement, the consent of Congress is essential. And we do not deem it necessary in this discussion to inquire whether such an agreement may possess a certain binding force between the States that are parties to it, for any purpose, before such consent is obtained.
As there seems to be no question, then, that the State of West Virginia, from the time she first proposed, in the constitution under which she became a State, to receive these *56 counties, has ever since adhered to, and continued her assent to that proposition, three questions remain to be considered.
1. Did the State of Virginia ever give a consent to this proposition which became obligatory on her ?
2. Did the Congress give such consent as rendered the agreement valid ?
3. If both these are answered affirmatively, it may be necessary to inquire whether the circumstances alleged in this bill, authorized Virginia to withdraw her consent, and justify us in setting aside the contract, and restoring the two counties to that State.
To determine these questions it will be necessary to examine into the history of the creation of the State of West Virginia, so far as this is to be learned from legislation, of which we can take judicial notice.
The first step in this matter was taken by the organic convention of the State of Virginia, which in 1861 reorganized that State, and formed for it what w7as known as the Pierpont- government — an organization which was recognized by the President- and by Congress as the State of Virginia, and which passed the four statutes set forth as exhibits in the bill of complainant. This convention passed an ordinance, August 30,1861, calling a convention of delegates from certain designated counties of the State of Virginia to form a constitution for a new State to be called Kanawha..
The third section of that ordinance provides that the convention when assembled may change the boundaries of the new State as described in the first section, so as to include the “ counties of Greenbrier and Pocahontas, or either of them, and also the counties of Hampshire, Hardy, Morgan, Berkeley, and Jefferson, or either of them,” if the said counties, or either of them, shall declare their wish, by a majority of votes giveu, and shall elect delegates to the said convention.
It is thus seen that in the very first step to organize the new State, the old State of Virginia recognized the peculiar condition of the two counties now in question, and provided that either of them should become part of the new State upon the *57 majority of tbe votes polled being found to be in favor of that proposition.
The convention authorized by this ordinance assembled in Wheeling, November 26, 1861. It does not appear that either Berkeley or Jefferson was represented, but it framed a constitution which, after naming the counties composing the-new State in the first section of the first'article, provided, by the second section, that if a majority of the votes cast at an election to be held for that purpose in the district composed of the counties of Berkeley, Jefferson, and Frederick, should be in favor of adopting the constitution, they should form a part of the State of West Virginia. That constitution also provided for representation of these counties in the Senate and House of Delegates if they elected to become a part of the new State, and that they should in that event constitute the eleventh judicial district. A distinct section also declares, in general terms, that additional territory may be admitted into and become part of the State with the consent of the legislature.
The schedule of this constitution arranged for its submission to a vote of the people on the first Thursday in April, 1862.
This vote was taken and the constitution ratified by the people; but it does not appear that either of the three counties of Jefferson, Berkeley, and Frederick, took any vote at that time.
Next in order of this legislative history is the act of the Virginia legislature of May 18, 1862, passed shortly after the vote above mentioned had been taken.* This act gives the consent of the State of Virginia to the formation of the State of West Virginia out of certain counties named under the provisions set forth in its constitution, and by its second section it is declared that the consent of the legislature of Virginia is also given that the counties of Berkeley, Jefferson, and Frederick, shall be included in said State “ lohenever the. voters of said counties shall ratify and assent to said consti *58 tution, at an election held for that purpose, at such time and under such regulations as the commissioners named in the said schedule may prescribe.”
This act was directed to be sent to the senators and representatives of Virginia in Congress, with instructions to obtain the consent of Congress to the admission of the State of West Virginia into the Union.
Accordingly on the 31st of December, 1862, Congress acted on these matters, and reciting the proceedings of the Convention of West Virginia, and that both that convention and the legislature of the State of Virginia had requested that the new State should be admitted into the Union, it passed an act for the admission of said State, with certain provisions not material to our purpose.
Let us pause a moment aud consider what is the fair and reasonable inference to be drawn from the actions of the State of Virginia, the Convention of West Virginia, and the Congress of the United States in regard to these counties.
The State of Virginia, in the ordinance which originated the formation of the new State, recognized something peculiar in the condition of these two counties, aud some others: It gave them the option of sending delegates to the constitutional convention, and gave that convention the option to receive them. For some reason not developed in the legislative history of the matter these counties took no action on the subject. The convention, willing to accept them, aud hoping they might still express their wish to come in, made provision in the new constitution that they might do so, and for their place in the legislative bodies, and in the judicial system, and inserted a general proposition for accession of territory to the new State. The State of Virginia, in expressing her satisfaction with the new State and its constitution, and her consent to its formation, by a special section, refers again to the counties of Berkeley, Jefferson, and Frederick, and enacts that whenever they shall, by a majority vote, assent to the constitution of the new State, they may become part thereof; and the legislature sends this statute to Congress with a request that it will admit the new *59 State into the Union. Now, we have here, on two different occasions, the emphatic legislative proposition of Virginia that these counties might become part of West Virginia; and we have the. constituí ion of West Virginia agreeing to accept them and providing for their place in the new-born State. There was one condition, however, imposed by Virginia to her parting with them, and one condition made by West Virginia to her receiving them, and that was the same, namely, the assent of the majority of the votes of the counties to the transfer.
It seems to us that here was an agreement between the old State and the new that these counties should become part of the latter, subject to that condition alone. Up to this time no vote had been taken in these counties; probably none could be taken, under any but a hostile government. At all events, the bill alleges that none was taken on the proposition of May, 1862, of the Virginia legislature. If an agreement means the mutual consent of the parties to a given proposition, this was an agreement between these States for the transfer of these counties on the condition named. The condition was one which could be ascertained or carried out at any time; and this was clearly the idea of Virginia when she declared that whenever the voters of said counties should ratify and consent to the constitution they should become part of the State; and her subsequent legislation making special provision for taking the vote on this subject, as shown by the acts of'January 31st and February 4th, 1863, is in perfect accord with this idea, and shows her good faith in carrying into effect the agreement.
2. But did Congress consent to this agreement ?
Unless it can be shown that the consent of Congress, under that clause of the Constitution which forbids agreements between States without it, can only be given in the form of an express and formal statement of every proposition of the agreement, and of its consent thereto, we must hold that the consent of that body was given to this agreement.
*60 The attention of Congress was called to the subject by tbe very short statute of the State of Virginia requesting the admission of the new State into the Union, consisting of but three sections,* one of which was entirely devoted to giving consent that these two counties and the county of Frederick might accompany the others, if they desired to do so. The constitution of the new State was literally cumbered with the various provisions for receiving these counties if they chose to come, and in two or three forms.express consent is there given to this addition to the State. The subject of the relation of these counties to the others, as set forth in the ordinance for calling the convention, in the constitution framed by that convention, and in the act of the Virginia legislature, must have received the attentive consideration of Congress. To hold otherwise is. to suppose that the act for the admission of the new State passed without any due or serious consideration. But the substance of this act clearly repels any such inference; for it is seen that the constitution of the new State was, in one particular at least, unacceptable to Congress, and the act only admits the State into the Union when that feature shall be changed by the popular vote. If any other part of the constitution had failed to meet the approbation of Congress, especially so important a part as the proposition for a future change of boundary between the new and the old State, it is reasonable to suppose that its dissent would have been expressed in some shape, especially as the refusal to permit those counties to attach themselves to the new State would not have endangered its formation and admission without them.
It is, therefore, an inference clear and satisfactory that Congress by that statute, intended to consent to the admission of the State with the contingent boundaries provided for in its constitution and in the statute of Virginia, which prayed for its admission on those terms, and that in so doing it necessarily consented to the agreement of those States on that subject.
*61 There was then a valid agreement between the two States consented to by Congress, which agreement made the accession of these counties dependent on the result of a popular vote in favor of that proposition.
3. But the Commonwealth of Virginia insists that no such vote was ever given; and we must inquire whether the facts alleged in the bill are such as to require an issue to be made on that question by the answer of the defendant.
The bill alleges the failure of the counties to take any action under the act of May, 1862, and that on the 31st of January and the 4th of February thereafter the two other acts we have mentioned were passed to enable such vote to be taken. These statutes provide very minutely for the taking of this vote under the authority of the State of Virginia; and, among other things, it is enacted that the governor shall ascertain the result, and, if he shall be of qpinion that said vote has been opened and held and the result ascertained and certified pursuant to law, he shall certify that result under the seal of the State to the governor of West Virginia; and if a majority of the votes given at the polls were in favor of the proposition, then the counties became pai’t of said State. He was also authorized to postpone the time-of voting if he should be of opinion that a fair vote could not be taken on the day mentioned in these acts.
Though this language is taken mainly from the statute which refers to Berkeley County, we consider the legal effect of the other statute to be the same.
These statutes were in no way essential to evidence the consent of Virginia to the original agreement, but were intended by her legislature to provide the means of ascertaining the wishes of the voters of these counties, that being the condition of the agreement on which the transfer of the counties depended.
The State thus showed her good faith to that agreement, and undertook in her own way and by her own officers to ascertain the fact in question.
*62 The legislature might have required the vote to have been reported to it, and assumed the duty of ascertaining and making known the result to West Virginia; but it delegated that power to the governor. It invested him with full discretion as to the time when the vote should be taken, and made his opinion and his decision conclusive as to the result. The vote was taken under these statutes, and certified to the governor. ,He was of opinion that the result was in favor of the transfer. ■ He certified this fact under the seal of the State to the State of West Virginia, and the legislature of that State immediately assumed jurisdiction over the two counties, provided for their admission, and they have been a part of that State ever since.
■Do the allegations of the bill authorize us to go behind all this and inquire as to what took place at this voting? To inquire how many votes were actually cast? How many of the men who had once been voters in these counties were then in the rebel army ? Or-had been there and were thus disfranchised ? For all these and many more embarrassing questions must arise if the defendant is required to take issue on the allegations of the bill on this subject. ■
These allegations are indefinite and vague in this regard. It is charged that no fair vote was taken ; but no act of unfairness is alleged. That no opportunity was afforded for a fair vote. That the governor was misled and deceived by the fraud of those who made him believe so. This is the substance of what is alleged. No one is charged specifically with the fraud. No particular act of fraud is stated. The governor is impliedly said to have acted in good faith. No charge of any kind of moral or legal wrong is made against the defendant, the State of West Virginia.
But, waiving these defects in the bill, we are of opinion that the action of the governor is conclusive of the vote as between the States of Virginia and West Virginia. He was in legal effect the State of Virginia in this matter. In addition to his position as executive head of the State, the legislature delegated to him all its own power in the premises. It vested him with large control as to the time of taking the *63 vote, and it made his opinion of the result the condition of final action. It rested of its own accord the whole question on his judgment and in his hands. In a matter where that action w'as to be the foundation on which another sovereign State was to act — a matter which involved the delicate question of permanent boundary between the States and jurisdiction over a large population — a matter in which she took into her own hands the ascertainment of the fact on which these important propositions were by contract made to depend, she must be. bound by what she has done. She can have no right, years after all this has been settled, to come into a court of chancery to charge that her own conduct has been a wrong and a fraud; that her own subordinate agents have misled her governor, and that her solemn act transferring these counties shall be set aside, against the will of the State of West Virginia, and without consulting the wishes of the people of those counties.
This view of the subject renders it unnecessary to inquire into the effect of the act of 1865 withdrawing the consent of the State of Virginia, or the adt of Congress of 1866 giving consent, after the attempt of that State to withdraw hers.
The demurrer to the bill is therefore sustained, and the
Bill must be dismissed.

 12 Peters, 724.

 7 Howard, 660.

 17 Id. 478.

 23 Howard, 505.

 Supra, p. 42.

 Supra, p. 42.