## UNITED STATES *v.* TEXAS.

### ORIGINAL.

*No. 5. Original. Argued December 9, 1891. — Decided February 29, 1892.*

The Supreme Court of the United States has original jurisdiction of a suit in equity brought by the United States against a State to determine the boundary between that State and a Territory of the United States, and that question is susceptible of judicial determination.

Although it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent, that principle has no application to a suit by one government against another government.

The exercise by this court of original jurisdiction in a suit brought by one State against another to determine the boundary line between them, or in a suit brought by the United States against a State to determine the boundary between a Territory of the United States and that State, so far from infringing, in either case, upon the sovereignty, is with the consent of the State sued.

A suit in equity being appropriate for determining the boundary between two States, the fact that the present suit is in equity, and not at law, is no valid objection to it.

In equity. The bill was filed by the Attorney General by direction of Congress, contained in section 25 of the act of May 2, 1890, 26 Stat. 81, 92, c. 182, "to provide a temporary government for the Territory of Oklahoma, to enlarge the jurisdiction of the United States Court in the Indian Territory, and for other purposes." That section was as follows:

"Sec. 25. That inasmuch as there is a controversy between the United States and the State of Texas as to the ownership

of what is known as Greer County, it is hereby expressly pro-
vided that this act shall not be construed to apply to said
Greer County until the title to the same has been adjudicated
and determined to be in the United States; and in order to
provide for a speedy and final judicial determination of the
controversy aforesaid, the Attorney General of the United
States is hereby authorized and directed to commence in the
name and on behalf of the United States, and prosecute to a
final determination, a proper suit in equity in 'the Supreme
Court of the United States against the State of Texas, setting
forth the title and claim of the United States to the tract of
land lying between the North and South Forks of the Red
River where the Indian Territory and the State of Texas ad-
join, east of the one hundredth degree of longitude, and
claimed by the State of Texas as within its boundary and a
part of its land, and designated on its map as Greer County,
in order that the rightful title to said land may be finally de-
termined ; and the court, on the trial of the case may, in its
discretion, so far as the ends of justice will warrant, consider
any evidence heretofore taken and received by the Joint
Boundary Commission under the act of Congress approved
January thirty-first, eighteen hundred and eighty-five; and
said case shall be advanced on the docket of said court, and
proceeded with to its conclusion as rapidly as the nature
and circumstances of the case permit."

The relief sought by the bill was the "determining and set-
tling the true boundary line between the United States and
the State of Texas, and to determine and put at rest questions
which now exist as to whether the Prairie Dog Town Fork or
the North Fork of Red River, as aforesaid, constitutes the
true boundary line of the treaty of 1819."

The State of Texas answered and demurred to the bill assign-
ing four causes of demurrer, only three of which were insisted
upon at the argument, viz. :

"1. That it appears by the complainant's own showing by
the said bill that she is not entitled to the relief prayed by the
bill against this defendant, in that complainant seeks by her
said bill to obtain from this court a decree judicially settling

and determining the true boundary line between the United States of America and the State of Texas, which question is political in its nature and character and not susceptible of judicial determination by this court in the exercise of its jurisdiction as conferred by the Constitution and laws of the United States.

"2. That it appears by the terms of complainant's bill that this is a suit by the United States of America against the State of Texas, and it is not competent, under the Constitution and laws of the United States of America, for said United States of America to sue one of its component States in her own courts. And especially is it true that said United States is not empowered under her Constitution and laws to sue the State of Texas, in a court of the United States, for the recovery of a right mutually claimed by the United States of America and the State of Texas, to wit, the ownership of certain designated territory, and the establishment of the boundary line between the respective governments."

"4. That this court sitting as a court of equity has no jurisdiction to hear and determine this controversy between complainant and defendant, because, as appears from complainant's bill and amended bill, complainant's cause of action is legal and not equitable, and that it is a suit or action to recover certain real property claimed by complainant and fully described in the bill of complaint; and if complainant has any right to recover, such right must be asserted, if at all, in a court of law and not in a court of equity as herein attempted. And this defendant further says that so much of the Act of Congress of May 2, 1890, under which this suit is brought, and which authorizes and directs the Attorney General of the United States to commence in this court in the name and on behalf of the United States and to prosecute to a final determination a proper suit in equity setting forth the title and claims of the United States to the tract of land in controversy, is unconstitutional and void in this, that it is not competent under the Constitution of the United States for the Congress of the United States to declare that a suit at law shall be a suit in equity, and that legal rights shall be tried

and determined in the courts of the United States as if they were equitable rights."

*Mr. A. H. Garland* for the State of Texas, in support of the demurrer. *Mr. John Hancock*, *Mr. George Clark*, *Mr. C. A. Culberson* and *Mr. H. J. May* were with him on the brief.

I.  Before considering the demurrers it seems to us proper that the preliminary question should be called to the attention of the court whether the State of Texas is suable in this cause. As a State cannot be sued without its express consent the inquiry is whether the defendant has authorized this suit to be instituted and prosecuted against it.  In our opinion it is not a matter of choice of tribunals or expediency of interposing the privilege of exemption from suit, but it involves the jurisdiction of the court, and upon it depends the validity of any decree which may be rendered. *Rhode Island* v. *Massachusetts*, 12 Pet. 657.

At no time has the State of Texas expressed its consent to this suit.  Neither the executive nor any other officer has authority to consent that the State should be sued, and it does not appear that such authority has been conferred upon the governor by statute : so that, although an appearance has been entered, the question is still open whether the State is suable.

We do not overlook the settled rule that in cases in which a State shall be a party, in which this court has original jurisdiction, the adoption of the Constitution gave the consent of the States to be sued. *Rhode Island* v. *Massachusetts*, 12 Pet. 657; in this case, however, as we shall hereafter attempt to show, this provision of the Constitution is inapplicable. *United States* v. *Ferreira*, 13 How. 40, and note by Chief Justice Taney on page 52; *Florida* v. *Georgia*, 17 How. 478.

II.  The first demurrer suggests not only that the question is in its nature political but that, contrary to the rule governing controversies between two States of the Union, it is such a political question that this court cannot judicially determine it in the exercise of the jurisdiction conferred by the Constitu-

tion. That a controversy respecting the boundary between two independent nations is a political and not a judicial question is well settled. A question like this respecting the boun-. daries of nations, is, as has .been truly said, more a political than a legal question; and in its discussion the courts of every country must respect the pronounced will of the legislature. "The judiciary is not that department of the government to which the assertion of its interests against foreign powers is confided." *Foster* v. *Neilson,* 2 Pet. 253, 306; *Cherokee Nation* v. *Georgia,* 5 Pet. 1; *United States* v. *Arredondo,* 6 .Pet. 691, 710; *Garcia* v. *Lee,* 12 Pet.. 511.

This rule undoubtedly applied to the treaty of 1819 between the United States and Spain, to that of 1832 between the .United States and Mexico and to that of 1838 between the United States and the Republic of Texas, when they were respectively ratified, and no reason is perceived why, after Texas was admitted into the Union, a different principle should control. The several treaties remain intact and are the contracts which define and regulate the relations of the contracting powers. *Wilson* v. *Wall,* 6 Wall. 83, 87.

So, also, the method or tribunal provided by the treaty for the settlement of differences arising thereunder must be resorted to; and as the treaties under consideration stipulate that the boundary shall be determined and marked by commissioners appointed by the respective powers, certainly not a judicial tribunal, it is evident that in its inception the question was political, to be adjusted according to the course of nations, and so remains. *Green* v. *Biddle,* 8 Wheat. 1; *United States* v. *Ferreira,* 13 How. 40.

But if the court shall be of opinion that this controversy, coming over from a time when the two governments were independent, is not a political question to be determined upon principles of law applicable to nations, but is analogous to boundary differences. between States of the Union of which the court has original jurisdiction, (*Florida* v. *Georgia,* 17 How. 478; *Rhode Island* v. *Massachusetts,* 12 Pet. 657; *Alabama* v. *Georgia,* 23 How. 505, 510; *Virginia* v. *West Virginia,* 11. Wall. 39;) then it is submitted that the judicial power of the

United States, and especially the original jurisdiction of this court, does not extend to controversies between the United States and an individual State.

III. As to the contention embodied in the second ground of demurrer, the Constitution provides that the judicial power shall extend to controversies to which the " United States shall be a party;" to "controversies between two or more States;" "between a State and citizens of another State," and "between a State or the citizens thereof, and foreign States, citizens or subjects." The Supreme Court, by the clause immediately following, is given original jurisdiction only in ".cases affecting Ambassadors, other public ministers and consuls, and those in which a State shall be a party." It is to be noticed that wherever a State is mentioned in the clause declaring the extent of the judicial power, the opposite party to the controversy is also mentioned and in no instance does it include the United States. In other words, the parties with whom the separate States can have legal controversies cognizable in the courts of the United States by reason of the parties thereto, are distinctly named and all others are necessarily excluded. Keeping in view the Eleventh Amendment, it has been justly said, so far as the present question is concerned, that the controversies over which the United States courts are given jurisdiction are "those to which the United States might be a party; those to which a State of the Union might be a party, *where the opposite party was another State of the Union.*" 2 Curtis Hist. Const. 444.

The clause establishing the judicial power is arranged by subjects and parties, carefully and accurately grouped, and the cases in which the United States shall be a party are distinctly separated from those in which a State may be. The cases of which this court has original jurisdiction are defined alone by reference to the parties and only two classes of cases are included, namely: those affecting ambassadors, other public ministers and consuls, and those in which a State, in cases over which the judicial power is by the preceding clause extended, shall be a party. In all the other cases mentioned the jurisdiction is declared to be appel-

late. It seems manifest to us, therefore, that the judicial power does not extend to controversies between the United States and an individual State, nor is the Supreme Court given original jurisdiction in such cases. In this connection, as strengthening this position and illustrating the purpose of the framers of the Constitution, it is worthy of mention that although it was proposed in the Convention to stretch the judicial power to all questions which "involve the national peace and harmony" and " all controversies *between the United States and an individual State* or the United States and the citizens of an individual State," neither of the propositions, in the breadth proposed, were adopted.

A more specific proposition to vest in the judiciary of the United States authority " to examine into and decide upon the claims of the *United States and an individual State to territory* " was peremptorily rejected. Mr. Justice Campbell in *Florida* v. *Georgia,* 17 How. 521.

That this court is without original jurisdiction in cases in which the United States shall be a party was held by Chief Justice Taney in a note to the case of the *United States* v. *Ferreira,* 13 How. 52. Subsequently, it is true, he delivered the opinion of the court in the case of *Florida* v. *Georgia,* 17 How. 478, in which the United States were permitted to adduce evidence in the controversy between Georgia and Florida, but neither the decision nor the opinion indicate a change of views on the subject. The opinion distinctly announces that the " court do not regard the United States, in this mode of proceeding, as either plaintiff or defendant; and they are, therefore, not liable to a judgment against them, nor entitled to a judgment in their favor."

The true rule on the subject is thus stated by Mr. Justice Curtis in his dissenting opinion in the above case, and it is not necessarily inconsistent, we think, with the opinion of the majority of the court :

" In distributing this jurisdiction, the Constitution has provided that, in all cases in which a State shall be a party, the Supreme Court shall have original jurisdiction.. In all other cases before mentioned, the Supreme Court shall have appel-

late jurisdiction. One of the other cases before mentioned, is a controversy to which the United States is a party.

"I am not aware that any doubt has ever been entertained by any one, that controversies to which the United States are a party, come under the appellate jurisdiction of this court in this distribution of jurisdiction by the Constitution. Such is the clear meaning of the words of the Constitution. So it was construed by the Congress, in the judiciary act of 1789, which, by the 11th section, conferred on the Circuit Courts jurisdiction of cases in which the United States are plaintiffs, and so it has been administered to this day. . . . We have, then, two rules given by the Constitution. The one, that if a State be a party, this court shall have original jurisdiction; the other, that if the United States be a party, this court shall have only appellate jurisdiction. And we are as clearly prohibited from taking original jurisdiction of a controversy to which the United States is a party, as we are commanded to take it if a State be a party. Yet, when the United States shall have been admitted on this record to become a party to this controversy, both a State and the United States will be parties to the same controversy. And if each of these clauses of the Constitution is to have its literal effect, the one would require and the other prohibit us from taking jurisdiction.

"It is not to be admitted that there is any real conflict between these clauses of the Constitution, and our plain duty is so to construe them that each may have its just and full effect. This is attended with no real difficulty. When, after enumerating the several distinct classes of cases and controversies to which the judicial power of the United States shall extend, the Constitution proceeds to distribute that power between the Supreme and inferior courts, it must be understood as referring, throughout, to the classes of cases before enumerated, as distinct from each other.

"And when it says: 'In all cases in which a State shall be a party, the Supreme Court shall have original jurisdiction,' it means, in all the cases before enumerated in which a State shall be a party. Indeed, it says so, in express terms, when it

speaks of the other cases where appellate jurisdiction is given.

" So that this original jurisdiction, which depends solely on the character of the parties, is confined to the cases in which are those enumerated parties, and those only. ·

" It is true, this course of reasoning leads necessarily to the conclusion that the United States cannot be a party to a judicial controversy with a State in any court.·

" But this practical result is far from weakening my confidence in the correctness of the reasoning by which it has been arrived at. The Constitution of the United States substituted a government acting on individuals, in place of a confederation which legislated for the States in their collective and sovereign capacities. The continued existence of the States, under a republican form of government, is made essential to the existence of the national government. And the fourth section of the fourth article of the Constitution pledges the power of the nation to guarantee to every State a republican form of government ; to protect each against invasion, and, on application of its legislature or executive, against domestic violence. This conservative duty of the whole towards each of its parts, forms no exception to the general proposition, that the Constitution confers on the United States powers to govern the people, and not the States.

" There is, therefore, nothing in the general plan of the Constitution, or in the nature and objects of the powers it confers, or in the relations between the general and state governments, to lead us to expect to find there a grant of power over judicial controversies between the government of the Union and the several States."

If this position be sound it necessarily follows that the act of Congress under which the suit is instituted is void. *Marbury* v. *Madison,* 1 Cranch, 137. *In re Metzger,* 5 How. 176.

IV. It is finally insisted, as ground of demurrer, and set out in the amended answer of defendant, " that this court sitting as a court of equity has no jurisdiction to hear and determine this controversy between complainant and defendant."

If it be true that the right asserted under the act of Con-

gress and set out in the bill is a legal and not an equitable right, there can be no doubt of the want of authority in Congress to direct its prosecution by proceedings in equity, for the distinction between legal and equitable rights and remedies is recognized by the Constitution. *Bennett* v. *Butterworth*, 11 How. 669; *Thompson* v. *Railroad Companies*, 6 Wall. 134; *Scott* v. *Neely*, 140 U. S. 106.

The right claimed by the United States in this case is the legal title to the body of land forming the county of Greer. It asserts this legal title, undertakes to trace it through solemn muniments and seeks to recover possession of the land.

The State of Texas also claims title to the land through the same treaties, and asserts its right of possession not only under said treaties, but under the reservation of ownership contained in the articles of annexation to the United States.

It is believed the cause of action as defined in the act and set out in the bill is legal and not equitable, and consequently the bill should be dismissed. *Lewis* v. *Cocks*, 23 Wall. 466; *Eoker* v. *Rolle*, 3 Ves. Jr. 4; *Cavedo* v. *Billings*, 16 Florida, 261.

*Mr. Edgar Allan* (with whom was *Mr. Attorney General* on the brief) for the United States, opposing.

MR. JUSTICE HARLAN delivered the opinion of the court.

This suit was brought by original bill in this court pursuant to the act of May 2, 1890, providing a temporary government for the Territory of Oklahoma. The 25th section recites the existence of a controversy between the United States and the State of Texas as to the ownership of what is designated on the map of Texas as Greer County, and provides that the act shall not be construed to apply to that county until the title to the same has been adjudicated and determined to be in the United States. In order that there might be a speedy and final judicial determination of this controversy the Attorney General of the United States was authorized and directed to commence and prosecute on behalf of the United States a

proper suit in equity in this court against the State of Texas, setting forth the title of the United States to the country lying between the North and South Forks of the Red River where the Indian Territory and the State of Texas adjoin, east of the one hundredth degree of longitude, and claimed by the State of Texas as within its boundary. 26 Stat. 81, 92, c. 182, § 25.

The State of Texas appeared and filed a demurrer, and, also, an answer denying the material allegations of the bill. The case is now before the court only upon the demurrer, the principal grounds of which are : That the question presented is political in its nature and character, and not susceptible of judicial determination by this court in the exercise of its jurisdiction as conferred by the Constitution and laws of the United States ; that it is not competent for the general government to bring suit against a State of the Union in one of its own courts, especially when the right to be maintained is mutually asserted by the United States and the State, namely, the ownership of certain designated territory ; and that the plaintiff's cause of action, being a suit to recover real property, is legal and not equitable, and, consequently, so much of the act of May 2, 1890, as authorizes and directs the prosecution of a suit in equity to determine the rights of the United States to the territory in question is unconstitutional and void.

The necessity of the present suit as a measure of peace between the General Government and the State of Texas, and the nature and importance of the questions raised by the demurrer, will appear from a statement of the principal facts disclosed by the bill and amended bill.

By a treaty between the United States and Spain, made February 22, 1819, and ratified February 19, 1821, it was provided :

" ART. 3. The boundary line between the two countries, west of the Mississippi, shall begin on the Gulph of Mexico, at the mouth of the river Sabine, in the sea, continuing north, along the western bank of that river, to the 32d degree of latitude ; thence, by a line due north, to the degree of latitude where it strikes the Rio Roxo of Natchitoches or *Red River* ;

then following the course of the Rio Roxo, westward, to the degree of longitude 100 west from London and 23 from Washington; then, crossing the said Red River, and running thence, by a line due north, to the river Arkansas; thence, following the course of tho southern bank of the Arkansas, to its source, in latitude 42 north; and thence, by that parallel of latitude, to the South Sea. The whole being as laid down in Melish's map of the United States, published at Philadelphia, improved to the 1st of January, 1818. But, if the source of the Arkansas River shall be found to fall north or south of latitude 42, then the line shall run from the said source due south or north, as the case may be, till it meets the said parallel of latitude 42, and thence, along the said parallel, to the South Sea. All the islands in the Sabine, and the said Red and Arkansas Rivers, throughout the course thus described, to belong to the United States; but the use of the waters, and the navigation of the Sabine to the sea, and of the said rivers Roxo and Arkansas, throughout the extent of the said boundary, on their respective banks, shall be common to the respective inhabitants of both nations.

"The two high contracting parties agree to cede and renounce all their rights, claims and pretensions to the territories described by the said line; that is to say: the United States hereby cede to his Catholic Majesty, and renounce forever, all their rights, claims and pretensions, to the territories lying west and south of the above-described line; and in like manner, his Catholic Majesty cedes to the said United States, all his rights, claims and pretensions, to any territories east and north of the said line; and for himself, his heirs and successors, renounces all claim to the said territories forever." 8 Stat. 252, 254, 256, Art. 3.

For the purpose of fixing the line with precision, and of placing landmarks to designate the limits of both nations, it was stipulated that each appoint a commissioner and a surveyor, who should meet, before the end of one year from the ratification of the treaty, at Natchitoches, on the Red River, and run and mark the line " from the mouth of the Sabine to the Red River, and from the Red River to the River Arkan-

sas, and to ascertain the latitude of the source of the said river Arkansas, in conformity to what is above agreed upon and stipulated, and the line of latitude 42, to the South Sea;" making out plans and keeping journals of their proceedings, and the result to be considered as·part of the treaty, having the same force as if it had been inserted· therein. Art. 4, 8 Stat. 256.

At the date of the ratification of this treaty, the country now constituting Texas belonged to Mexico, part of the monarchy of Spain. Subsequently, in 1824, Mexico became a separate independent power, whereby the boundary line designated in the treaty of 1819 became the line between the United States and Mexico.

On the 12th of January, 1828, a treaty between the United States and Mexico was concluded, and subsequently, April 5, 1832, was ratified, whereby, as between those governments, the validity of the limits defined by the treaty of 1819 was confirmed. 8 Stat. 372.

By a treaty concluded April 25, 1838, between the United States· and the Republic of Texas, which was ratified and proclaimed October 13, 1838, it was declared that the treaty of limits made and concluded in 1828 between the United States and Mexico " is binding upon the Republic ·of Texas." And in order to prevent future disputes and collisions in regard to the boundary between the two countries; as designated by the treaty of 1828, it was stipulated :

" ART. 1. Each of the contracting parties shall appoint a commissioner and surveyor; who shall meet before the termination of twelve months from the exchange of the ratifications of this convention, at New Orleans, and proceed to run and mark that portion of the said. boundary which extends from the mouth of the Sabine, where that river enters the Gulf of Mexico, to the Red River. They shall make. out plans and keep journals of their proceedings, and the result agreed upon by them shall be considered as part of this convention, and shall have the same force as if it were inserted ·therein. . . · .

" ART. 2. And it is agreed that until this line is marked out as is provided for in the foregoing article, each of the con-

tracting parties shall continue to exercise jurisdiction in all territory over which its jurisdiction has hitherto been exercised, and that the remaining portion of the said boundary line shall be run and marked at such time hereafter as may suit the convenience of both the contracting parties, until which time each of the said parties shall exercise without the interference of the other, within the territory of which the boundary shall not have been so marked and run, jurisdiction to the same extent to which it has been heretofore usually exercised." .8 Stat. 511.

The treaty of 1838 had not been executed on the 1st day of March, 1845, when Congress, by joint resolution, consented that "the territory properly included within, and rightfully belonging to the Republic of Texas, may be erected into a new State" upon certain conditions. 5 Stat. 797. Those conditions having been accepted, Texas by a joint resolution of Congress passed December 29, 1845, was admitted into the Unio: on an equal footing with the original States in all respects whatever. 9 Stat: 108.

By an act of Congress, approved September 9, 1850, certain. propositions were made on behalf of the United States to the State of Texas, to become obligatory upon the parties when accepted by Texas, if such acceptance was given on or before December 1, 1850. One of those propositions was that Texas would agree that its boundary on the north should commence at the point at which the meridian of one hundred degrees west from Greenwich is intersected by the parallel of thirty-six degrees thirty minutes north latitude, and run from that point due west to the meridian of one hundred and three degrees west from Greenwich, thence due south to the thirty-second degree of north latitude, thence on the parallel of thirty-two degrees of north latitude to the Rio Bravo de Norte, and thence with the channel of said river to the Gulf of Mexico; another, that Texas cede to the United States all her claim to territory exterior to the above limits and boundaries. In consideration of said establishment of boundaries, cession of claim to territory and relinquishment of claims, the United States agreed to pay to Texas the sum of ten mil-

lions of dollars in a stock bearing five per cent interest, and redeemable at the end of fourteen years, the interest payable half-yearly at the Treasury of the United States. 9 Stat. 446, c. 49.

By an act of assembly approved November 25, 1850, the above propositions were accepted by Texas, and it agreed to be bound by them according to their true import.

During the whole period of nearly forty years succeeding the treaty of 1819 no action, except as above indicated, was taken to settle the boundary line in question. But, in the year 1859, a joint commission on the part of the United States and Texas commenced the work of running that line, but separated without reaching any conclusion. Nevertheless, in 1860, the commissioner upon the part of the United States completed the work, without the coöperation of the commissioner of Texas, and reported the result to the General Land Office in 1861. According to the determination of the Commissioner on the part of the United States, and under certain surveys made from 1857 to 1859, pursuant to a contract between two persons named Jones and Brown and the Commissioner of Indian Affairs, the true dividing and boundary line between the United States and the United Mexican States began where the one hundredth meridian touched the main Red River aforesaid, running thence along the line or course of what is now known as the South Fork of the Red River or river of the treaty of 1819.

After the commissioners of the United States and Texas had failed to reach an agreement, the legislature of Texas, by an act approved February 8, 1860, declared, "that all the territory contained in the following limits, to wit: Beginning at the confluence of Red River and Prairie Dog River, thence running up Red River, passing the mouth of South Fork and following main or North Red River to its intersection with the twenty-third degree of west longitude; thence due north across Salt Fork and Prairie Dog River, and thence following that river to the place of beginning; be, and the same is hereby, created into a county to be known by the name and style of the county of Greer." And by acts of its officers,

proceeding under its statutes, Texas assumed and exercised control and jurisdiction of the territory constituting what is called the county of Greer.

Notwithstanding those assertions of control and jurisdiction, Texas, by an act approved May 2, 1882, made provision for running and marking the line in question. That act provided for the appointment by the governor of a suitable person or persons, who, in conjunction with such person or persons as might be appointed by or on behalf of the United States for the same purpose, should run and mark the boundary line between the Territories of the United States and the State of Texas, in order that "the question may be definitely settled as to the true location of the one hundredth degree of longitude west from London, and whether the North Fork of Red River, or the Prairie Dog Fork of said river, is the true Red River designated in the treaty between the United States and Spain, made February 22, 1819."

By an act of Congress, approved January 31, 1885, provision was made for the appointment of a commission by the President to act with the commission to be appointed by the State of Texas in ascertaining and marking the point where the one hundredth meridian of longitude crosses Red River, in accordance with the terms of the treaty of 1819; the person or persons so appointed to make report of his or their action in the premises to the Secretary of the Interior, who should transmit the same to Congress at its next session after the report was made. 23 Stat. 296, c. 47.

Under the last-mentioned acts a joint commission was organized, and it assembled at Galveston, Texas, on February 23, 1886. Being unable to agree as to whether the stream now known as the North Fork of the Red River, or that now called the South Fork or Main Red River, was the river referred to in the treaty of 1819, the joint commission adjourned *sine die* with the understanding that each commission would make its report to the proper authorities and await instructions. The commissioners on the part of the United States reported that "the Prairie Dog Town Fork is the true boundary, and that the monument should be placed at the intersec-

tion of the one hundredth meridian with this stream;" while the commission on the part of Texas reported that "the North Fork of Red River, as now named and delineated on the maps, is the Rio Roxo or Red River delineated on Melish's maps; described in the treaty of February 22, 1819, and is the boundary line of said treaty to the point where the one hundredth degree of west longitude crosses the same."

The United States claims to have jurisdiction over all the territory acquired by the treaty of 1819, containing 1,511,576.17 acres, between what has been designated as the Prairie Dog Town Fork, or Main Red River, and the North Fork of Red River, being the extreme portion of the Indian Territory lying west of the North Fork of the Red River, and east of the one hundredth meridian of west longitude from Greenwich; and that its right to said territory, so far from having been relinquished, has been continuously asserted from the ratification of the treaty of 1819 to the present time.

The bill alleges that the State of Texas, without right, claims, has taken possession of, and endeavors to extend its laws and jurisdiction over, the disputed territory, in violation of the treaty rights of the United States; that, during the year 1887, it gave public notice of its purpose to survey and place upon the market for sale, and otherwise dispose of, that territory; and that, in consequence of its proceeding to eject *bona fide* settlers from certain portions thereof, President Cleveland, by proclamation issued December 30, 1887, warned all persons, whether claiming to act as officers of the county of Greer, or otherwise, against selling or disposing of, or attempting to sell or dispose of, any of said lands, or from exercising or attempting to exercise any authority over them, and "against purchasing any part of said territory from any person or persons whatever." 25 Stat. 1483.

The relief asked is a decree determining the true line between the United States and the State of Texas, and whether the land constituting what is called "Greer County," is within the boundary and jurisdiction of the United States or of the State of Texas. The government prays that its rights, as asserted in the bill, be established, and that it have such other relief as the nature of the case may require.

·In support of the contention that the ascertainment of the boundary between a Territory of the United States and one of the States of the Union is political in its nature and character, and not susceptible of judicial determination, the defendant cites *Foster* v. *Neilson,* 2 Pet. 253, 307, 309; *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 21; *United States* v. *Arredondo,* 6 Pet. 691, 711; and *Garcia* v. *Lee,* 12 Pet. 511, 517.

In *Foster* v. *Neilson,* which was an action to recover certain lands in Louisiana, the controlling question was as to whom the country between the Iberville and the Perdido rightfully belonged at the time the title of the plaintiff in that case was acquired. The United States, the court said, had perseveringly insisted that by the treaty of St. Ildefonso made October 1, 1800, Spain ceded the disputed territory as part of Louisiana to France, and that France by the treaty of Paris of 1803 ceded it to the United States. Spain insisted that the cession to France comprehended only the territory which at that time was denominated Louisiana. After examining various articles of the treaty of St. Ildefonso, Chief Justice Marshall, speaking for the court, said: "In a controversy between two nations concerning national boundary, it is scarcely possible that the courts of either should refuse to abide by the measures adopted by its own government. There being no common tribunal to decide between them, each determines for itself on its own rights, and if they cannot adjust their differences peaceably, the right remains with the strongest. The judiciary is not that department of the government to which the assertion of its interests against foreign powers is confided; and its duty commonly is to decide upon individual rights, according to those principles which the political departments of the nation have established. If the course of the nation has been a plain one, its courts would hesitate to pronounce it erroneous." Again: "After these acts of sovereign power over the territory in dispute, asserting the American construction of the treaty by which the government claims it, to maintain the opposite construction in its own courts would certainly be an anomaly in the history and practice of nations. If those departments which are entrusted with the foreign intercourse

of the nation, which assert and maintain its interests against foreign powers, have unequivocally asserted its rights of dominion over a country of which it is in possession, and which it claims under a treaty; if the legislature has acted on the construction thus asserted, it is not in its own courts that this construction is to be denied. A question like this respecting the boundaries of nations, is, as has been truly said, more a political than a legal question; and, in its discussion, the courts of every country must respect the pronounced will of the legislature."

In *United States v. Arredondo* the court, referring to *Foster v. Neilson*, said: "This court did not deem the settlement of boundaries a judicial but a political question — that it was not its duty *to lead, but to follow* the action of the other departments of the government." The same principles were recognized in *Cherokee Nation v. Georgia* and *Garcia v. Lee.*

These authorities do not control the present case. They relate to questions of boundary between independent nations, and have no application to a question of that character arising between the General Government and one of the States composing the Union, or between two States of the Union. By the Articles of Confederation, Congress was made "the last resort on appeal in all disputes and differences" then subsisting or which thereafter might arise "between two or more States concerning boundary, jurisdiction or any other cause whatever;" the authority so conferred to be exercised by a special tribunal to be organized in the mode prescribed in those Articles, and its judgment to be final and conclusive. Art. 9. At the time of the adoption of the Constitution there existed, as this court said in *Rhode Island v. Massachusetts*, 12 Pet. 657, 723, 724, controversies between eleven States, in respect to boundaries, which had continued from the first settlement of the colonies. The necessity for the creation of some tribunal for the settlement of these and like controversies that might arise, under the new government to be formed, must, therefore, have been perceived by the framers of the Constitution, and, consequently, among the controversies to which the judicial power of the United States was extended

by the Constitution, we find those between two or more States. And that a controversy between two or more States, in respect to boundary, is one to which, under the Constitution, such judicial power extends, is no longer an open question in this court. The cases of *Rhode Island* v. *Massachusetts*, 12 Pet. 657; *New Jersey* v. *New York*, 5 Pet. 284, 290; *Missouri* v. *Iowa*, 7 How. 660; *Florida* v. *Georgia*, 17 How. 478; *Alabama* v. *Georgia*, 23 How. 505; *Virginia* v. *West Virginia*, 11 Wall. 39, 55; *Missouri* v. *Kentucky*, 11 Wall. 395; *Indiana* v. *Kentucky*, 136 U. S. 479; and *Nebraska* v. *Iowa, ante,* 359, were all original suits, in this court, for the judicial determination of disputed boundary lines between States. In *New Jersey* v. *New York*, 5 Pet. 284, 290, Chief Justice Marshall said : "It has then been settled by our predecessors, on great deliberation, that this court may exercise its original jurisdiction in suits against a State, under the authority conferred by the Constitution and existing acts of Congress." And in *Virginia* v. *West Virginia*, it was said by Mr. Justice Miller to be the established doctrine of this court "that it has jurisdiction of questions of boundary between two States of this Union, and that this jurisdiction is not defeated, because in deciding that question it becomes necessary to examine into and construe compacts or agreements between those States, or because the decree which the court may render, affects the territorial limits of the political jurisdiction and sovereignty of the States which are parties to the proceeding." So, in *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 287, 288 ; "By the Constitution, therefore, this court has original jurisdiction of suits brought by a State against citizens of another State, as well as of controversies between two States. .. . . As to 'controversies between two or more States.' The most numerous class of which this court has entertained jurisdiction is that of controversies between two States as to the boundaries of their territory, such as were determined before the Revolution by the King in Council, and under the Articles of Confederation (while there was no national judiciary) by committees or commissioners appointed by Congress."

In view of these cases, it cannot, with propriety, be said that a question of boundary between a Territory of the United States and one of the States of the Union is of a political nature, and not susceptible of judicial determination by a court having jurisdiction of such a controversy. The important question therefore, is, whether this court can, under the Constitution, take cognizance of an original suit brought by the United States against a State to determine the boundary between one of the Territories and such State. Texas insists that no such jurisdiction has been conferred upon this court, and that the only mode in which the present dispute can be peaceably settled is by agreement, in some form, between the United States and that State. Of course, if no such agreement can be reached — and it seems that one is not probable — and if neither party will surrender its claim of authority and jurisdiction over the disputed territory, the result, according to the defendant's theory of the Constitution, must be that the United States, in order to effect a settlement of this vexed question of boundary, must bring its suit in one of the courts of Texas — that State consenting that its courts may be open for the assertion of claims against it by the United States — or that, in the end, there must be a trial of physical strength between the government of the Union and Texas. The first alternative is unwarranted both by the letter and spirit of the Constitution. Mr. Justice Story has well said: " It scarcely seems possible to raise a reasonable doubt as to the propriety of giving to the national courts jurisdiction of cases in which the United States are a party. It would be a perfect novelty in the history of national jurisprudence, as well as of public law, that a sovereign had no authority to sue in his own courts. Unless this power were given to the United States, the enforcement of all their rights, powers, contracts and privileges in their sovereign capacity would be at the mercy of the States. They must be enforced, if at all, in the state tribunals." . Story Const. § 1674. The second alternative, above mentioned, has no place in our constitutional system, and cannot be contemplated by any patriot except with feelings of deep concern.

The cases in this court show that the framers of the Constitution did provide, by that instrument, for the judicial determination of all cases in law and equity between two or more States, including those involving questions of boundary. Did they omit to provide for the judicial determination of controversies arising between the United States and one or more of the States of the Union? This question is in effect answered by *United States* v. *North Carolina*, 136 U. S. 211. That was an action of debt brought in this court by the United States against the State of North Carolina, upon certain bonds issued by that State. The State appeared, the case was determined here upon its merits, and judgment was rendered for the State. It is true that no question was made as to the jurisdiction of this court, and nothing was therefore said in the opinion upon that subject. But it did not escape the attention of the court, and the judgment would not have been rendered except upon the theory that this court has original jurisdiction of a suit by the United States against a State. As, however, the question of jurisdiction is vital in this case, and is distinctly raised, it is proper to consider it upon its merits.

The Constitution extends the judicial power of the United States "to all cases, in law and equity, arising under this Constitution, the laws of the United States and treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, other public ministers and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more States; between a State and citizens of another State; between citizens of different States; between citizens of the same State claiming lands under grants of different States, and between a State or the citizens thereof and foreign States, citizens or subjects.

"In all cases, affecting ambassadors or other public ministers and consuls, and those in which a State shall be party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such ex-

ceptions, and under such regulations as the Congress shall make." Art. 3, § 2. " The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or. prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State." 11th Amendment.

It is apparent upon the face of these clauses that in one class of cases the jurisdiction of the courts of the Union depends " on the character of the cause, whoever may be the parties," and, in the other, on the character of the parties, whatever may be the subject of controversy. *Cohens* v. *Virginia*, 6 Wheat. 264, 378, 393. The present suit falls in each class, for it is, plainly, one arising under the Constitution, laws and treaties of the United States, and, also, one in which the United States is a party. It is, therefore, one to which, by the express words of the Constitution, the judicial power of the United States extends. That a Circuit Court of the United States has not jurisdiction, under existing statutes, of a suit by the United States against a State, is clear; for by the Revised Statutes it is declared — as was done by the Judiciary Act of 1789 — that " the Supreme Court shall have exclusive. jurisdiction of all controversies of a civil nature where a State is a party, except between a State and its citizens, or between a State and citizens of other States or aliens, in which latter cases it shall have original, but not exclusive, jurisdiction." Rev. Stat. § 687; Act of September 24, 1789, c. 20, § 13; 1 Stat. 80. Such exclusive jurisdiction was given to this court, because it best comported with the dignity of a State, that a case in which it was a party should be determined in the highest, rather than in a subordinate judicial tribunal of the nation. Why then may not this court take original cognizance of the present suit involving a question of boundary between a Territory of the United States and a State?

The words, in the Constitution, " in all cases . . . in which a State shall be party, the Supreme Court shall have original jurisdiction," necessarily refer to all cases mentioned in the preceding clause in which a State may be made, of right, a party defendant, or in which a State may, of right, be

a party plaintiff. It is admitted that these words do not refer to suits brought against a State by its own citizens or by citizens of other States, or by citizens or subjects of foreign States, even where such suits arise under the Constitution, laws and treaties of the United States, because the judicial power of the United States does not extend to suits of *individuals* against States. *Hans* v. *Louisiana*, 134 U. S. 1, and authorities there cited; *North Carolina* v. *Temple*, 134 U. S. 22, 30. It is, however, said that the words last quoted refer only to suits in which a State is a party, and in which, also, the opposite party is another State of the Union or a foreign State. This cannot be correct, for it must be conceded that a State can bring an original suit in this court against a citizen of another State. *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 287. Besides, unless a State is exempt altogether from suit by the United States, we do not perceive upon what sound rule of construction suits brought by the United States in this court — especially if they be suits the correct decision of which depends upon the Constitution, laws or treaties of the United States — are to be excluded from its original jurisdiction as defined in the Constitution. That instrument extends the judicial power of the United States "to *all* cases," in law and equity, arising under the Constitution, laws and treaties of the United States, and to controversies in which the United States shall be a party, and confers upon this court original jurisdiction "in *all* cases" "in which a State shall be party," that is, in all cases mentioned in the preceding clause in which a State may, of right, be made a party defendant, as well as in all cases in which a State may, of right, institute a suit in a court of the United States. The present case is of the former class. We cannot assume that the framers of the Constitution, while extending the judicial power of the United States to controversies between two or more States of the Union, and between a State of the Union and foreign States, intended to exempt a State altogether from suit by the General Government. They could not have overlooked the possibility that controversies, capable of judicial solution, might arise between the United States and some

of the States, and that the permanence of the Union might be endangered if to some tribunal was not entrusted the power to determine them according to the recognized principles of law. And to what tribunal could a trust so momentous be more appropriately committed than to that which the people of the United States, in order to form a more perfect Union, establish justice and insure domestic tranquillity, have constituted with authority to speak for all the people and all the States, upon questions before it to which the judicial power of the nation extends? It would be difficult to suggest any reason why this court should have jurisdiction to determine questions of boundary between two or more States, but not jurisdiction of controversies of like character between the United States and a State.

Mr. Justice Bradley, speaking for the court in *Hans* v. *Louisiana,* 134 U. S. 1, 15, referred to what had been said by certain statesmen at the time the Constitution was under submission to the people, and said : " The letter is appealed to now, as it was then, as a ground for sustaining a suit brought by an individual against a State. . . . The truth is, that the cognizance of suits and actions unknown to the law, and forbidden by the law, was not contemplated by the Constitution when establishing the judicial power of the United States. Some things, undoubtedly, were made justiciable which were not known as such at the common law; such, for example, as controversies between States as to boundary lines, and other questions admitting of judicial solution. And yet the case of *Penn* v. *Lord Baltimore,* 1 Ves. Sen. 444, shows that some of these unusual subjects of litigation were not unknown to the courts even in colonial times; and several cases of the same general character arose under the Articles of Confederation, and were brought before the tribunal provided for that purpose in those articles. 131 U. S. App. 50. The establishment of this new branch of jurisdiction seemed to be necessary from the extinguishment of diplomatic relations between the States." That case, and others in this court relating to the suability of States, proceeded upon the broad ground that " it is inherent in the nature of sovereignty not

to be amenable to the suit of an *individual* without its consent."

The question as to the suability of one government by another government rests upon wholly different grounds. Texas is not called to the bar of this court at the suit of an individual, but at the suit of the government established for the common and equal benefit of the people of all the States. The submission to judicial solution of controversies arising between these two governments, " each sovereign, with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other," *McCulloch* v. *State of Maryland*, 4 Wheat. 316, 400, 410, but both subject to the supreme law of the land, does no violence to the inherent nature of sovereignty. The States of the Union have agreed, in the Constitution, that the judicial power of the United States shall extend to *all* cases arising under the Constitution, laws and treaties of the United States, without regard to the character of the parties, (excluding, of course, suits against a State by its own citizens or by citizens of other States, or by citizens or subjects of foreign States,) and equally to controversies to which the United States shall be a party, without regard to the subject of such controversies, and that this court may exercise original jurisdiction in all such cases, " in which a State shall be party," without excluding those in which the United States may be the opposite party. The exercise, therefore, by this court, of such original jurisdiction in a suit brought by one State against another to determine the boundary line between them, or in a suit brought by the United States against a State to determine the boundary between a Territory of the United States and that State, so far from infringing, in either case, upon the sovereignty, is with the consent of the State sued. Such consent was given by Texas when admitted into the Union upon an equal footing in all respects with the other States.

We are of opinion that this court has jurisdiction to determine the disputed question of boundary between the United States and Texas.

It is contended that, even if this court has jurisdiction, the

dispute as to boundary must be determined in an action at
law, and that the act of Congress requiring the institution of
this suit in equity is unconstitutional and void as, in effect,
declaring that legal rights shall be tried and determined as if
they were equitable rights.   This is not a new question in
this court.   It was suggested in argument, though not decided,
in *Fowler* v. *Lindsey*, 3 Dall. 411, 413.   Mr. Justice Wash-
ington, in that case, said : " I will not say that a State could
sue at law for such an incorporeal right as that of sovereignty
and jurisdiction ; but even if a court of law would not afford
a remedy, I can see no reason why a remedy should not be
obtained in a court of equity.   The State of New York might,
I think, file a bill against the State of Connecticut, praying
to be quieted as to the boundaries of the disputed territory ;
and this court, in order to effectuate justice, might appoint
commissioners to ascertain and report those boundaries."   But
the question arose directly in *Rhode Island* v. *Massachusetts*,
12 Pet. 657, 734, which was a suit in equity in this court
involving the boundary line between two States.   The court
said : " No court acts differently in deciding on boundary
between States, than on lines between separate tracts of land ;
if there is uncertainty where the line is, if there is a confusion
of boundaries by the nature of interlocking grants, the oblit-
eration of marks, the intermixing of possession under different
proprietors, the effects of accident, fraud or time or other kin-
dred causes, it is a case appropriate to equity.   An issue at
law is directed, a commission of boundary awarded ; or, if the
court are satisfied without either, they decree what and where
the boundary of a farm, a manor, a province or a State is and
shall be."   When that case was before the court at a subse-
quent term, Chief Justice Taney, after stating that the case was
of peculiar character, involving a question of boundary between
two sovereign States, litigated in a court of justice, and that
there were no precedents as to forms and modes of proceedings,
said : " The subject was however fully considered at January
term, 1838, when a motion was made by the defendant to
dismiss this bill.   Upon that occasion the court determined to
frame their proceedings according to those which had been

adopted in the English courts, in cases most analogous to this, where the boundaries of great political bodies had been brought into question. And, acting upon this principle, it was then decided, that the rules and practice of the Court of Chancery should govern in conducting this suit to a final issue. The reasoning upon which that decision was founded is fully stated in the opinion then delivered; and upon reëxamining the subject, we are quite satisfied as to the correctness of this decision." 14 Pet. 210, 256. The above cases, *New Jersey* v. *New York*, *Missouri* v. *Iowa*, *Florida* v. *Georgia*, *Alabama* v. *Georgia*, *Virginia* v. *West Virginia*, *Missouri* v. *Kentucky*, *Indiana* v. *Kentucky*, and *Nebraska* v. *Iowa*, were all original suits in equity in this court, involving the boundary of States. In view of these precedents, it is scarcely necessary for the court to examine this question anew. Of course, if a suit in equity is appropriate for determining the boundary between two States, there can be no objection to the present suit as being in equity and not at law. It is not a suit simply to determine the legal title to, and the ownership of, the lands constituting Greer County. It involves the larger question of governmental authority and jurisdiction over that territory. The United States, in effect, asks the specific execution of the terms of the treaty of 1819, to the end that the disorder and public mischiefs that will ensue from a continuance of the present condition of things may be prevented. The agreement, embodied in the treaty, to fix the lines with precision, and to place landmarks to designate the limits of the two contracting nations, could not well be enforced by an action at law. The bill and amended bill make a case for the interposition of a court of equity.

*Demurrer overruled.*

Mr. Chief Justice Fuller, with whom concurred Mr. Justice Lamar, dissenting.

Mr. Justice Lamar and myself are unable to concur in the decision just announced.

This court has original jurisdiction of two classes of cases

only, those affecting ambassadors, other public ministers and consuls, and those in which a State shall be a party.

The judicial power extends to "controversies between two or more States;" "between a State and citizens of another State;" and "between a State or the citizens thereof, and foreign States, citizens or subjects." Our original jurisdiction, which depends solely upon the character of the parties, is confined to the cases enumerated, in which a State may be a party, and this is not one of them.

The judicial power also extends to controversies to which the United States shall be a party, but such controversies are not included in the grant of original jurisdiction. To the controversy here the United States is a party.

We are of opinion, therefore, that this case is not within the original jurisdiction of the court.